SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Sam M. ANTAR, Allen Antar, and Benjamin Kuszer, Defendants,

and

Rori ANTAR, Sam A. Antar, Michelle Antar, Adam Kuszer, Sam Kuszer, Simon Kuszer, Rose Antar, and Sam M. Antar, Relief Defendants.

No. CIV.A. 93–3988(HAA).

United States District Court, D. New Jersey.

July 16, 1998.

Securities and Exchange Commission, Washington, D.C., Attn: Richard D. Simpson, David L. Kornblau.

Susan C. Cassell, Office of U.S. Attorney, Newark, NJ, for S.E.C.

Saiber Schlesinger Satz & Goldstein, Newark, Attn: Bruce I. Goldstein, Esq., William S. Gyves, Esq.

Bruce I. Goldstein, Saiber Schlesinger Satz & Goldstein, Newark, NJ, Gerald Krovatin, Arseneault & Kravatin, Chatham, NJ, for Sam M. Antar, Rori Antark, Michelle Antar.

Bruce I. Goldstein, Saiber Schlesinger Satz & Goldstein, Newark, NJ, Peter J. Kurshan, Chase, Kurshan, Suhr, Herzfeld & Rubin, Newark, NJ, for Sam Kuszer.

David M. Kohane, Cole, Schotz, Meisel, Forman, & Leonard, Hackensack, NJ, Gerald Krovatin, Arseneault & Kravatin, Chatham, NJ, for Sam M. Antar.

Gersten, Savage, Kaplowitz, Fredericks & Curtin, LLP, New York, NY, Attn: Marvin Gersten.

Peter J. Kurshan, Chase, Kurshan, Suhr, Herzfeld & Rubin, Newark, NJ, for Benjamin Kuszer, Adam Kuszer, Simon Kuszer.

Douglas T. Tabachnik, Manalapan, NJ, for Rose Antar.

Solomon E. Antar, Brooklyn, NY, pro se.

*OPINION*

HAROLD A. ACKERMAN, District Judge.

## I. *INTRODUCTION*

There is perhaps no more insidious drain on the overall welfare of society than greed unchecked. The saga of the Antar family and their operation of a major retail consumer electronics business is but a manifestation of that tenet. In this and related cases, it has become evident that various members of the Antar family engaged in a pattern of fraud and deceit in their attempt to enrich themselves by selling securities, the price of which had been artificially inflated through a multitude of schemes. This appears to be the last chapter in a story of a family and its deception of the public.

This matter concerns allegations of insider trading in the stock of Crazy Eddie, Inc. ("Crazy Eddie"), a defunct electronics retailer which, during the relevant time period, operated stores in New York, New Jersey, and Connecticut. At the heart of this case are allegations that defendants Sam M. Antar, Allen Antar, and Benjamin Kuszer, along with others not part of this action, engaged in an extensive, multifaceted fraud which consisted of cash skimming, falsification of inventory counts, and the inflation of sales figures of certain key stores, for the purpose, according to the plaintiff Securities and Exchange Commission (the "SEC"), of artificially inflating the price of Crazy Eddie stock. The SEC further contends that the defendants, having artificially and fraudulently inflated the price of the stock, then sold their substantial stockholdings to an unwitting public, while profiting in excess of $20 million.

On September 8, 1993, the SEC initiated this civil enforcement action. The SEC filed an Amended Complaint on April 24, 1997, alleging insider trading in violation of § 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b–5, 17 C.F.R. § 240.10b–5. Specifically, the SEC alleges that in violation of federal securities laws, the defendants sold Crazy Eddie stock when they knew or were reckless in not knowing that:

(a) Crazy Eddie had materially misstated its earnings growth in the years prior to its initial public offering in 1984 ("IPO") by systematically and gradually scaling back an alleged cash skimming scheme so as to skim from the Company's proceeds $3 million in 1980, $2.5 to 2 million in 1981, $1.5 million in 1982 and less than $1 million in 1983, *see Amended Complaint,* ¶¶ 3, 28;

(b) in the years subsequent to the IPO, Crazy Eddie had fraudulently overstated its pretax income by engaging in a series of inventory inflation schemes and related frauds, *id.* at ¶¶ 3, 33–44, 57–67; and

(c) subsequent to the IPO, Crazy Eddie had implemented a series of schemes designed to artificially inflate the sales growth figures reported for certain key stores whose performance was closely monitored by the investing public, *id.* at ¶¶ 3, 45–56.

In addition, the SEC alleges that Eddie Antar ("Eddie"), the son of defendant Sam M. Antar and a co-founder of Crazy Eddie, sold certain shares of Crazy Eddie stock on behalf of the children of Allen Antar and Benjamin Kuszer when he knew or was reckless in not knowing that the company's earnings growth prior to the IPO had been materially misstated. *Id.* at ¶ 5.

Based on these alleged instances of insider trading in violation of the federal securities laws, the SEC seeks an order:

(a) enjoining Sam M. Antar, Allen Antar, and Benjamin Kuszer from engaging in future violations of the securities laws; and

(b) requiring Sam M. Antar, Allen Antar, Benjamin Kuszer, along with the Relief Defendants, to disgorge the illegal profits allegedly made and losses allegedly avoided as a result of their trading.

*See Final Pretrial Order,* § 13.

This court has jurisdiction over this matter pursuant to §§ 20(b) and 22(a) of the Securities Act and §§ 21(d)(1) and 27 of the Ex-

change Act. 15 U.S.C. §§ 77t(b), 77v(a), 78u(d)(1), 78aa.[1] Venue is proper in this district pursuant to § 22 of the Securities Act and § 27 of the Exchange Act. 15 U.S.C. §§ 77v, 78aa. The SEC has the burden of proving its allegations by a preponderance of the evidence. *See SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 355, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (establishing preponderance of evidence standard for actions involving § 17(a) of Securities Act); *Herman & MacLean v. Huddleston,* 459 U.S. 375, 389–90, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (establishing preponderance of evidence standard for actions involving § 10(b) of Exchange Act).

## II. *PRIOR CRIMINAL ACTIONS*

To better comprehend the nature of the present action, it is important to take note of the prior criminal action against two central figures in the alleged fraud at Crazy Eddie: Eddie and Mitchell Antar ("Mitchell").[2]

As will be discussed later in this opinion, the Antars' hegemony over Crazy Eddie came to an end in 1987. In September of that year, the SEC initiated an investigation into alleged violations of the federal securities laws by certain Crazy Eddie officers and employees. In February, 1987, the United States Attorneys' Office for the District of New Jersey commenced a federal grand jury investigation into the activities at the company. Both investigations focused on, among others, Eddie and Mitchell.

By this time, Eddie had begun to liquidate his assets in the United States and move them offshore. He also began to assume numerous other identities and obtain a variety of passports under those assumed names.

In September, 1989, Eddie was sued by the SEC for, among other things, disgorgement of illegally gained proceeds from the sale of his Crazy Eddie stock. *See SEC v. Eddie Antar et al.,* Civ. No. 89–3773 (D.N.J.) (JCL). In February, 1990, the court entered an order directing Eddie, among other things, to surrender over $52 million in funds he had previously transferred to Bank Leumi leIsrael, B.M. ("Bank Leumi") in Israel and held him in civil contempt for failing to appear before the court as previously ordered. He was ordered by the court to appear and purge himself of the civil contempt order. Eddie failed to appear and the court issued a warrant for his arrest.

Eddie remained at large, a fugitive from justice for approximately twenty-eight months. Using the many falsified passports and multiple aliases, Eddie traveled as a fugitive to Israel, the United Kingdom, France, Canada, Switzerland, Brazil, and the Cayman Islands. After a two-year international manhunt by the United States Marshals Service, in cooperation with the SEC, the Federal Bureau of Investigation, the United States Attorneys' Office, Interpol, the Israeli National Police, and other agencies, Eddie was finally located and arrested in Israel on June 24, 1992. After contesting extradition for some months in the Israeli courts, Eddie was extradited to the United States in January, 1993.

On August 10, 1993, a federal grand jury sitting in Newark returned a Superseding Indictment against Eddie, Mitchell, Allen Antar, and Eddie Gindi,[3] a cousin of the other three defendants who worked with them at Crazy Eddie. Count 1 of the Su-

---

**1.** The Exchange Act permits the SEC to bring an action in federal court "[w]henever it shall appear ... that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter." 15 U.S.C. § 78u(d)(1). The Exchange Act also provides federal courts with "exclusive jurisdiction of ... all suits in equity and actions at law brought to enforce any liability or duty created by this chapter." *Id.* at § 78aa. The Securities Act provides substantially similar grounds for federal subject matter jurisdiction.

**2.** Mitchell, son of Sam M. Antar, was an employee of Crazy Eddie from 1971 to 1987, when he

resigned from the company. In May, 1984, Mitchell became a member of the Board of Directors of Crazy Eddie. In December, 1986, he was appointed Chief Operating Officer and a member of its three-member Office of the President. The defendants in this action have alleged, and the SEC does not dispute, that throughout the relevant time period, Mitchell was one of the principal forces driving the fraudulent schemes giving rise to this litigation.

**3.** In June, 1993, Eddie Gindi's case was severed, and he thereafter became a government witness at trial.

perseding Indictment charged all four defendants with conspiracy to conduct or participate in the affairs of Crazy Eddie through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The alleged racketeering acts consisted of multiple acts of securities fraud and mail fraud arising from a scheme to falsify Crazy Eddie's books and records with the purpose of fraudulently inflating the market price of the company's securities. Counts 2 through 4 charged the defendants therein with causing false and misleading statements to be made in documents and reports Crazy Eddie filed with the SEC, in violation of 15 U.S.C. §§ 78m and 78ff(a). Count 5 charged the defendants therein with mail fraud in violation of 18 U.S.C. § 1341 arising from the mailing of a falsified SEC filing to a Crazy Eddie shareholder. Counts 6 through 16 charged Eddie with securities fraud arising from the sale of Crazy Eddie stock, in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b–5. Counts 17 and 18 charged Mitchell with similar fraud offenses. Count 19 charged the defendants therein with conspiracy to commit securities fraud and mail fraud in violation of 18 U.S.C. § 371.

All four defendants in the criminal action pled not guilty to the Superseding Indictment and proceeded to trial. On June 20, 1993, Eddie was found guilty on all counts charged against him, *i.e.*, Counts 1 through 16 and 19. Mitchell was found guilty on Counts 1 through 5 and 19, and acquitted on Counts 17 and 18. Allen Antar was acquitted of all charges. The convictions of Eddie and Mitchell, however, were overturned by the United States Court of Appeals for the Third Circuit, and the matter, as to them, was remanded and assigned to this court.

Thereafter, on May 8, 1996, Eddie pled guilty to one count of conspiracy to commit racketeering in connection with his activities at Crazy Eddie. In his allocution, Eddie admitted, among other things, the following:

1. prior to Crazy Eddie's initial public offering in September, 1984, and continuing through 1987, he and others agreed to carry out various schemes to falsify Crazy Eddie's books and records to make the company appear financially healthier than it actually was;

2. in 1985, he caused the value of Crazy Eddie's inventory to be overstated by approximately $2 million;

3. he caused the falsification of Crazy Eddie inventory count sheets, thereby overstating Crazy Eddie's 1986 fiscal year-end inventory by approximately $10 million;

4. he arranged for the delivery of approximately $2 million in merchandise to Crazy Eddie shortly prior to year-end 1986 and simultaneously arranged for post-dated invoices for this merchandise to be issued after the start of the next fiscal year;

5. he caused an infusion of approximately $2 million into bank accounts of Crazy Eddie comparable stores to inflate the reported sales in those stores;

6. in fiscal year-end 1987, he caused the falsification of Crazy Eddie inventory count sheets, thereby inflating inventory by millions of dollars;

7. the primary purpose of these schemes was to defraud the investing public by artificially inflating the price of Crazy Eddie stock; and

8. he urged Crazy Eddie employees to destroy business records to conceal the falsification of the company's business records from the SEC and others.

This court sentenced Eddie on February 10, 1997, *inter alia*, to eighty-two months imprisonment. *See United States v. Antar*, Criminal Action No. 92–347 (D.N.J.) (HAA). In total, between 1984 and 1987, Eddie sold approximately 6.5 million shares of Crazy Eddie stock for proceeds in excess of $74 million.

On October 10, 1996, Mitchell followed suit and pled guilty to one count of causing false and misleading statements to be made in documents and reports Crazy Eddie filed with the SEC and one count of conspiracy to commit securities and mail fraud. In his allocution, Mitchell admitted, among other things, the following:

1. in 1986 and 1987, he and others connected with Crazy Eddie agreed to carry out various schemes to falsify Crazy Ed-

die's books and records to make the company appear financially healthier that it actually was;

2. during the company's fiscal year 1987, he and others fraudulently inflated comparable store sales;

3. he and others caused the falsification of inventory sheets for fiscal year-end 1987 to inflate reported inventory by $16 to $18 million;

4. he and others executed the approximately $20 million phony debit memo fraud at Crazy Eddie's 1987 fiscal year-end;

5. he was aware as of year-end 1987 that Crazy Eddie's reported inventory had been inflated by approximately an additional $25 million because temporarily borrowed merchandise had been included in the year-end inventory count;

6. he and others arranged for the delivery of merchandise to Crazy Eddie shortly prior to year-end 1987 and simultaneously arranged for post-dated invoices for most of the merchandise to be issued after the start of the next fiscal year; and

7. the primary purpose of these schemes was to increase the price of Crazy Eddie stock to public investors.

Mitchell was sentenced by this court on June 13, 1997, *inter alia*, to thirty months imprisonment. *See United States v. Antar*, Criminal Action No. 92–347 (D.N.J.) (HAA).

The case at bar followed on the heels of the criminal action against Eddie, Mitchell, and Allen Antar. In light of the past history of this case, the defendants herein, in large measure, do not dispute that various frauds were indeed perpetrated at Crazy Eddie. The predominant questions before this court, therefore, are what the extent of those frauds were, who was involved and to what degree, who had knowledge or was aware of the frauds occurring at Crazy Eddie, and who, if anyone, traded their Crazy Eddie stock on the strength of material, non-public information in violation of the federal securities laws.

**4.** Crazy Eddie was a Delaware corporation, with a principal place of business originally in Brook-

A trial without a jury was conducted before this court from September 9, 1997 to October 27, 1997. This court heard twenty-two days of testimony from fifteen witnesses, and nearly two hundred exhibits were admitted into evidence. What follows are this court's conclusions of fact and law pursuant to Federal Rule of Civil Procedure 52.

### III. CONCLUSIONS OF FACT

#### A. *The Parties and Credibility Determinations*

##### (1) *Sam M. Antar*

Defendant Sam M. Antar ("Sam M."), a resident of West End, New Jersey, co-founded and co-owned Crazy Eddie.[4] At the time of Crazy Eddie's IPO in September, 1984, and until late 1987, Sam M. was the Executive Vice President and a member of the Board of Directors of Crazy Eddie.

Together, Sam M. and his son Eddie built Crazy Eddie. As Sam M. testified at trial:

THE WITNESS: ... Oh, before any trouble, we were the greatest combination in the world. I had an idea, and he was a fantastic executor. I can come up with beautiful ideas, but I never was able to execute them, but Eddie was able to execute them.

*Testimony of Sam M. Antar*, Vol. 10.120. According to Sam M. and the other defendants, however, there was trouble within the tightly-knit family, with the main protagonists being Sam M. and Eddie. The defendants have attempted to persuade this court that a bitter and divisive family dispute, which began in the early 1980's and culminated in a near-complete fracture of the family in late 1983, made it nearly impossible for the members of the Antar family, particularly Sam M. and Eddie, to cooperate with each other in devising and executing the various fraudulent schemes alleged by the SEC. This dispute, the defendants contend, made it impossible for the Antars not only to carry out the cash skimming scheme prior to the IPO, but also to cooperate in the multitude of frauds perpetrated at Crazy Eddie between 1983 and 1987.

lyn, New York. In October, 1986, its headquarters were moved to Edison, New Jersey.

By all accounts, the relationship between Eddie and Sam M. was sound and stable during the early Crazy Eddie years of the 1970's. By the early 1980's, however, their relationship began to become strained as Sam M. voiced opposition to Eddie's personal lifestyle, including his heavy drinking and indiscrete extramarital affairs. Sam M. testified at trial on this point as follows:

Q. What was the nature of your relationship with Eddie Antar in 1983 before we get to New Year's Eve?

\* \* \* \* \* \*

A. It was fair. It was all right. We got along very, very well, but something seemed to be brewing.

\* \* \* \* \* \*

Q. Let me be more precise to you.

What was the status of his marital relationship in 1983?

A. That it was starting to—I would say starting to dwindle because he was running around, and I really did not go for that lifestyle because we live in a very tight-knit community.

\* \* \* \* \* \*

Q. Did you tell your son what you thought?

A. Oh, yes.

Q. Did he welcome your views?

A. No, I don't think so.

\* \* \* \* \* \*

Q. What did he say, if you remember?

A. What did he say?

"I am a big boy, I am over 21, you know."

You know, I can't tell him what to do.

*Testimony of Sam M. Antar*, Vol. 10.108–109. Eddie, for his part, felt that Sam M. was jealous of his success and resented Sam M.'s interference in his personal affairs.

The simmering feud erupted on the night of December 31, 1983. On that date, Eddie's wife, Debbie ("Debbie I"), arrived at Sam M.'s house in Brooklyn visibly upset over an argument with her husband. Apparently, Eddie had committed to celebrate New Year's Eve with Debbie I, but subsequently broke the engagement. Debbie I learned, however, that Eddie intended to celebrate the holiday with another woman, Debbie Erlich ("Debbie II"). Upon arriving at Sam M.'s house that evening, Debbie I advised Sam M. and his wife, Rose, that she intended to drive to Manhattan and confront her husband and his mistress. She was accompanied on this trip by Robin Antar, Mitchell's wife, and Ellen Kuszer, Eddie's sister and Benjamin Kuszer's wife. Debbie I ultimately confronted Eddie and Debbie II that evening, and the near-melee that broke out between them has been referred to by the family as the "New Year's Eve Massacre".

The next day, a visibly angry Eddie, who apparently blamed Sam M. for his marital difficulties, went to Sam M.'s house to confront him. Sam M. was not at home that day. Eddie, however, had a verbal dispute with his mother, Rose, who passed out from the stress. Sam M. apparently became so upset by Eddie's hostile response and treatment of Rose that in early January, 1984, he suffered a heart attack.

After the so-called New Year's Eve Massacre, the defendants contend that the family rift became far more pronounced, with family members taking sides. Sam E. Antar, Eddie's cousin, testified as to which family members sided with whom:

THE COURT: And some members of the Antar family took [Debbie I's] side, is that correct?

THE WITNESS: That is correct, sir.

THE COURT: And they were Sam M. Antar?

THE WITNESS: That is correct, sir.

THE COURT: Allen Antar?

THE WITNESS: Yes.

THE COURT: Who else?

THE WITNESS: Mitchell Antar.

THE COURT: Mitchell Antar, who else?

THE WITNESS: And Ben Kuszer.

*Testimony of Sam E. Antar*, Vol. 4.14–15. It appears that Sam E. Antar was one of the few who supported Eddie in this family dispute.

This court agrees with defendants that a family feud did exist, with Eddie and Sam M. as the main protagonists. This court does not agree, however, that the feud made it impossible for members of the Antar family, including the defendants herein, to cooperate in conducting the frauds at Crazy Eddie. The evidence reveals that the intensity of the family dispute waxed and waned over time, and it was not until late 1987 that it had any significant effects on the Crazy Eddie business. Prior to that time, the family feud did not prevent the Antars from operating Crazy Eddie, engaging in other business ventures, or indeed, perpetrating the extensive frauds at the company.

With respect to the relationship between Sam M. and Eddie, it does not appear to have been as fractured as the defendants would now have this court believe. For instance, after his heart attack in January, 1984, Sam M. recuperated for some time at Eddie's house in Oakhurst, New Jersey. Indeed, on his tax return for 1984, Sam M. listed Eddie's residence as his own "present home address." At the time, Eddie visited Sam M. and said, "you know, we are going public, Dad, we're going to be friends and all that. Everything is forgiven, everything is forgotten." *Deposition Testimony of Sam M. Antar,* January 24, 1992 at 2197–98.

In fact, by May, 1984, Sam M. and Eddie were working together on Crazy Eddie's IPO, and it appeared that the anger between them was subsiding. *See Testimony of Sam E. Antar,* Vol. 6.49 ("I recall sometime around when they were working together on the public offering that the anger was subsiding and that they were cooperating with one another...."). The defendants' characterizations of the relationship between the two men notwithstanding, Eddie and Sam M. were certainly cooperating to a sufficient degree that both went on the "road show" together to promote the IPO. There was no indication on the road show of a feud between the two, *see id.* at Vol. 2.34, and according to Sam M., by the time of the IPO, he and Eddie "were on very nice terms," *Testimony of Sam M. Antar,* Vol. 11.89–90.[5]

Sam M.'s position in this case that the New Year's Eve Massacre represented a clean fracturing of his relationship with Eddie is belied by his own testimony given in a previous deposition, in which he testified that significant strains in their relationship did not appear until August, 1986:

A. ... They were nice to me and stuff like that, and everything was hunkydory, and Eddie was very civil to Debbie and he treated her very, very well and he gave her his whole salary every week, and everything like that. Everything was very, very nice.

*Deposition Testimony of Sam M. Antar,* January 24, 1992 at 2202. It is clear to this court that whatever strains affected the personal relationship between Eddie and Sam M., they were able for quite some time to insulate their business relationship from these tensions. As Sam M. himself testified at trial:

Q. Isn't it a fact between January and May of 1984 you had a conversation with Eddie in which Eddie said to you, in words or substance, quote: "Everything is forgiven"?

A. Yeah. We had that—quite a few times we had that.... [E]verything was forgiven for, let's see, for the next couple of years, everything was forgiven. But down in the heart, it wasn't forgiven. It was forgiven because we had to be in business. I can't stop the business just like that, but I didn't like what he was doing. I didn't like his morals.

*Testimony of Sam M. Antar,* Vol. 16.46.

Thus, even if this court were to accept the defendants' theory of a divisive family dispute between Sam M., Allen Antar, and Benjamin Kuszer, on the one hand, and Eddie, on the other, the evidence presented at trial reveals that the tensions were not so great—at least before late 1986—that they were unable to cooperate in operating Crazy Eddie and perpetrating extensive frauds at the company. For example, Mitchell sided with Sam M. in the alleged family dispute. But Mitchell also admitted to conspiring with Ed-

---

5. In March, 1985, Sam M. also signed over a power of attorney to Eddie with respect to Sam M.'s sale of 150,000 shares of Crazy Eddie stock pursuant to a secondary public offering.

die to commit fraud at Crazy Eddie. In his allocution, Mitchell admitted that he had participated in and was aware of the multitude of frauds perpetrated at the company. Mitchell carried out these schemes despite the defendants' contention of a "bitter and deeply divisive" family dispute which supposedly made the level of cooperation necessary to carry out such scams impossible. Of significance is the fact that many of the frauds to which Mitchell admitted were perpetrated in 1986 and 1987, the time period when the family dispute was supposedly at its most bitter.

Moreover, despite the lingering family dispute, members of the Antar family engaged in new business ventures together. For instance, on or about April 15, 1985, Sam M., Eddie, Allen Antar, Benjamin Kuszer, among others, invested together in two real estate partnerships known as Deal–Rite Realty Associates and Rising Tide Real Estate Associates.

Upon close examination, there is no doubt that from the early 1980's forward, there was a lingering source of tension between Eddie and Sam M., with various family members taking sides in the dispute. What is also clear from the evidence, however, is that the family dispute was not so deeply divisive that the family members, no matter which side each chose to take, were unable to cooperate with each other to perpetrate the frauds at Crazy Eddie from 1979 through 1987. It is evident that the familial bad blood, while always simmering just beneath the surface, did not have a truly significant impact on the business until about April, 1987. As Sam M. himself testified at trial, the "familial war broke out after [Eddie] was served with the summons by" Debbie I in April, 1987 reopening the divorce action. *Testimony of Sam M. Antar*, Vol. 10.122. As will be discussed later in this opinion, after April, 1987, the family dispute was a factor in the eventual end of the Antars' run at Crazy Eddie, but even then it was not the sole factor.

Indeed, the ability of the members of the Antar family to segregate their personal differences from their business and other interests is clearly exemplified by their conduct in connection with the government's criminal prosecution for the frauds perpetrated at Crazy Eddie. With Eddie facing federal criminal charges, Sam M. was able to put their differences aside:

> A. ... I said, look, he is my son. I don't want you to think that I am that hard or anything, but all he had to do—all he has to do is pick up the phone and say Ma, Pa, help me. He is my son, still my flesh and blood.

*Testimony of Sam M. Antar*, Vol. 15.42. Sam M. forgave Eddie and paid for his legal bills, which ultimately came to between $1.5 million and $1.7 million. *Id.* at 16.38.

Time and again, the closely knit Antar family, and particularly Sam M. and Eddie, was able to put aside their personal differences for the greater common good, whether that be operating the Crazy Eddie business, joining forces in other business ventures, defending against federal criminal prosecutions, or getting rich off Crazy Eddie stock.

Sam M. testified for six days at trial. Over that time, this court obtained a rather clear sense of him as hardworking, ambitious, and highly intelligent. I also found him to be a skillful and inveterate liar. Sam M.'s evident strategy in this and related litigation appears to have been this: concede not one inch and admit to nothing; when confronted with prior conflicting testimony or evidence, be evasive; if boxed into an inescapable position, simply admit you lied then but now you are telling the truth. The record in this case is replete with instances where Sam M. has given inconsistent, contradictory testimony. Sam M.'s credibility, or lack thereof, becomes quite evident upon a review of his testimony concerning his role at Crazy Eddie.

In a deposition taken in 1992 in connection with a civil matter then-pending in the Eastern District of New York, entitled *In re Crazy Eddie, Inc. Securities Litigation*, Civ. No. 87–0033 (E.D.N.Y.), Sam M. provided what he admitted at trial in this case to have been false testimony concerning his secret bank accounts in Israel. Sam M. lied when he stated under oath that he had only one account at Bank Leumi in Israel:

Q. Sir, have you ever had any bank accounts in Israel?

A. I have had bank accounts in Israel.

Q. One or more than one?

A. One.

Q. Are you sure?

A. Almost sure.

Q. What does that mean?

A. I really don't know. . . .

Q. Didn't you open more than one bank account at Bank Leumi in Tel Aviv?

A. Not that I know of.

Q. What's your recollection as to how many bank accounts you opened at Bank Leumi in Tel Aviv?

A. One account.

*Deposition Testimony of Sam M. Antar,* January 22, 1992 at 1875–76. In fact, and as will be discussed in more detail later in this opinion, Sam M. had opened three accounts at Bank Leumi in Israel. Sam M.'s testimony in the securities litigation concerning the secret Israeli accounts was continually molded and adapted depending upon what information was already available to the opposing side:

Q. What was it that caused you to change your testimony?

A. Oh, what caused me to change my testimony was the amount of information that . . . Mr. Sirota [plaintiff's counsel in *In re Crazy Eddie, Inc. Securities Litigation* ], who was cooperating with you and with Solomon Antar, and because that information could have never been known unless Solomon Antar had to tell you, because nobody knew, not even Sam E., not even Uncle Eddy—

*Testimony of Sam M. Antar,* Vol. 15.13. Upon questioning by this court, Sam M. further testified:

A. . . . Your Honor, I hate to say this, but the reason that I am here right now is because of the man, Solomon Antar, who is—who was the attorney of the corporation, who was so devious and so—I cannot find the words to explain what happened.

\* \* \* \* \* \*

— in essence, once he told them, I had no other alternative but to tell the truth.

*Id.* at Vol. 15.15. Sam M. repeatedly made clear to this court that he told the "truth" only when he was backed into a corner:

A. . . . I remember the main thing is this: That I was deposed; that I got the deposition back; that I realized that they had all of the information—they had all of the goods on me, and I had to do something.

So now, the best thing to do is either try to lie your way out of it, or tell the truth about it, so I decided I have to tell the truth about it. There is no way out, and that is exactly what I did.

\* \* \* \* \* \*

But when I found out that I was dead—dead in the woods, let's use that expression, that they found out about my—they had all of the information, they knew everything that was going on, what I had in Israel, there was no sense for me to kid around anymore, so I had to come back and tell the truth the best that I could remember.

*Id.* at Vol. 15.47–48; Vol. 16.9.

Sam M. also gave conflicting testimony concerning the opening of his second account with Bank Leumi in Israel. In June, 1983, Sam M. withdrew approximately $2.8 million from his existing account and deposited the money into a second account at the bank. At his deposition in January, 1992, however, he denied that he ever made the transfers in the first place and stated that there was no reason for him to make such transfers. *Deposition Testimony of Sam M. Antar,* January 24, 1992 at 2179–80. Then in a May, 1992 deposition, Sam M. testified that he made the transfers—which he finally admitted—because Eddie had asked him to:

Q. What was there about those transfers that jogged your memory?

A. Yes. My wife and I were going to Israel and before we left—

\* \* \* \* \* \*

Before we left we saw Eddie. Eddie said, when you get to Israel, transfer some money from the account to you and my mother because of problems Eddie has

been having with his wife Debbie, that that money should belong to me.

*Deposition Testimony of Sam M. Antar,* May 21, 1992 at 57–58. Yet, at trial, Sam M. denied that he made the transfers at Eddie's request and testified unequivocally that Eddie "certainly did not" ask him to make the transfers. *Testimony of Sam M. Antar,* Vol. 16.10.

At trial, Sam M. also claimed that he never signed a document authorizing the transfer of any money at Bank Leumi: "As a matter of fact, if you look at all your papers, I never signed a document transferring any money at all. Solomon and Eddie did, but I didn't." *Testimony of Sam M. Antar,* Vol. 14.56. Upon questioning by this court, Sam M. immediately retracted this blanket statement:

THE COURT: Didn't you transfer money out of one of the accounts which—

THE WITNESS: In 1993? 1983? No, 1983, right.

THE COURT: Well, I thought you just said you didn't transfer any money out of any accounts. Did you or didn't you?

THE WITNESS: I didn't transfer any—at that time only that one time.

*Id.* On the following day of trial, Sam M. conceded that he made two more transfers from his bank accounts in Israel:

A. Yes. Matter of fact, I made two transfers.

Yes. That is the transfer that Mr. Shiv did—and then the transferring was transferring 12245 into 13459.

*Id.* at Vol. 15.7.

Sam M. also provided conflicting testimony concerning his son Allen Antar. At trial Sam M. testified that he fired Allen Antar from a business called "Sound Machine," in which he had a one-half ownership interest. Sam M. testified, "I threw him out myself," and on the question of whether Allen Antar left Sound Machine on good terms, he stated flatly, "no way." *Testimony of Sam M. Antar,* Vol. 10.102–103; Vol. 13.3. At his January, 1992 deposition, however, Sam M. provided a very different description:

Q. Do you recall a time when you threw your son Allen out of Sound Machine?

A. I didn't throw him out.

Q. Do you recall when he left Sound Machine?

A. Yes.

Q. When was that?

A. I don't remember.

Q. Did he leave on good terms?

A. Yes.

*Deposition Testimony of Sam M. Antar,* January 23, 1992 at 2015. At trial, Sam M. attempted to explain the inconsistency: "If I lied in the past, when I talk about—you talk about my son, I maybe like to cover certain things up, you know what I mean?" *Testimony of Sam M. Antar,* Vol. 13.35.

Unfortunately, this court does know what Sam M. means. It is evident that Sam M. provided inconsistent, intentionally erroneous information and testimony to protect his interests and the interests of his family members who have remained loyal to him. Sam M.'s credibility may be summed up nicely with his own testimony provided at trial:

A. ... You are 1000 percent right, you can show me 29 books of depositions. I did lie, I did lie, but I am not lying now.

\*　\*　\*　\*　\*　\*

So I lied the next day, and I lied the next day and I lied the next day, but eventually I changed my testimony, and today I am telling you the truth.

\*　\*　\*　\*　\*　\*

I thought I just answered it yeah. How many times do I hear it? I lied, I lied, I lied, I lied, I lied, I lied, but then I rescinded the lies and told them the truth. That is all I did.

*Testimony of Sam M. Antar,* Vol. 11.114; Vol. 11.119; Vol. 11.121.

Simply stated, this court cannot, as a general matter, accept Sam M.'s most recent pronouncements of his honesty.

#### (2) *Allen Antar*

Defendant Allen Antar ("Allen"), a resident of Oakhurst, New Jersey, is one of Sam M.'s three sons, and the brother of Eddie and Mitchell. From 1986 to 1987, Allen was the Director of Corporate Sales at Crazy Eddie. Prior to that time, Allen held various

other positions in the company, including salesman and manager.

Allen testified for three days at trial. From his testimony as well as other evidence presented in this case, it is clear to this court that in relation to his brothers and his father, Allen was cut from a slightly different cloth. Indeed, the picture presented of Allen is of a man not quite as ambitious or driven as his brothers or father. The evidence shows that Allen was not as instrumental as Eddie or his father in developing and implementing the schemes perpetrated at Crazy Eddie, nor was he as intricately involved in carrying out those schemes as Mitchell. But as a member of the family, Allen occupied a position of trust, and thus, he was in the unique position of not only being aware of what was happening at the company, but also sharing in the wealth.

At trial, however, Allen attempted to paint a wholly different picture. He attempted to show that because of various personal tensions between him and the family, he could not have been aware of, let alone involved in, the fraudulent schemes perpetrated at the company. Allen contends that in or about 1975, he was essentially banished form the family when he left his wife for another woman. For several years thereafter, he was *persona non grata* as far as his family was concerned. Allen ultimately returned to his wife and began working at Crazy Eddie in 1979. Allen contends that although back with the family, he was never brought into the inner circle of the family's business at Crazy Eddie, and thus, never participated in or was aware of the fraudulent schemes at Crazy Eddie. He contends that he was employed at the company as a low level salesman and a store manager until 1985, when he was fired by Eddie. When he returned to the company in 1986, he was given only the "nominal" position of overseeing the company's "modest" wholesale operations.

In addition to this ostracism from his family for his personal life, Allen also took Sam M.'s side after the New Year's Even Massacre. He contends that this further deepened the rift between him and Eddie, the main architect of the frauds at Crazy Eddie. He was therefore not included in the frauds perpetrated at the company.

The evidence presented in this case reveals that Allen has overstated the extent and severity of the tension between him and his family, particularly Eddie. What must be remembered is that the Antars' business activities were founded on their strong family bond. Thus, the interrelationship of members of the Antar family, as far as their business was concerned, was far more subtle, nuanced, and complex than what would ordinarily be found at other companies where business and family were not inextricably intertwined. Whatever transgressions were made by Allen, the fact remained that he was a member of the family, and thus, could be trusted like no outsider could ever be. This was particularly important as Crazy Eddie became more successful and opened new stores throughout the tri-state area. The sheer breadth of Crazy Eddie's business operations necessitated Allen's involvement, for the Antar family would not and could not easily trust anybody outside the family. That was simply not their makeup.

It is true that Allen did take Sam M.'s side after the New Year's Eve Massacre. But as with Sam M., this fact did not preclude his involvement in or his awareness of the frauds engineered by Eddie, for the Antars could and did set aside their personal differences for the good of the business. Indeed, the tension described by Allen is belied by the fact that Eddie approved a large raise for him in 1985. Allen's 1984 salary from Crazy Eddie, as reported to the Internal Revenue Service, was $21,000. In 1985, Eddie approved Allen's salary of $176,000, plus $295,558 from what Allen claims was the exercise of Crazy Eddie stock options.

As for his contention that he was fired from Crazy Eddie in 1985 after a heated disagreement with Eddie, there is a question as to whether this constituted a formal termination or simply a period when he stayed away from Eddie. There is, for example, evidence to suggest that he continued to get paid during this time, and that he attended a consumer electronics show in Las Vegas, Nevada along with other Crazy Eddie employees. Whatever the true nature of this epi-

sode stemming from his disagreement with Eddie, by 1986, Allen had become the Director of Corporate Sales at the company. This was not simply a "nominal" position as Allen would have this court believe.

As the discussion above suggests, Allen's apparent defense strategy was to downplay his role in the family's business. For instance, at trial, Allen attempted to conceal his use of luxury cars paid for by Crazy Eddie:

Q. By the way, in this trial there has been testimony that Crazy Eddie furnished you with a luxury car as an employee of Crazy Eddie. Is that so?

A. No.

\* \* \* \* \* \*

Q. Now, isn't it a fact, Mr. Antar, that Crazy Eddie provided you with a Jaguar?

A. No, sir.

Q. Well, did you drive a Jaguar?

A. Yes, sir.

Q. Where did you get it?

A. I leased it myself.

*Testimony of Allen Antar*, Vol. 18.8; Vol. 19.38–39. In a 1992 deposition, however, Allen provided the following testimony:

Q. On an income of $21,000 a year, how did you come to be driving a Jaguar?

\* \* \* \* \* \*

A. I think the company paid for my car at that time. I guess so.

*Deposition Testimony of Allen Antar*, January 21, 1992 at 158.

Under cross-examination at trial, Allen also conceded that he was driven to and from work in a chauffeur-driven limousine "a couple of times." *Testimony of Allen Antar*, Vol. 19.42. When pressed, Allen stated that he rode in the limousine for "maybe one year," but not a couple of years. *Id.* at Vol. 19.43. In his January, 1992 deposition, however, Allen testified that he was driven around in Crazy Eddie's limousine, "I would say a couple of years." *Deposition Testimony of Allen Antar*, January 22, 1992 at 218.

Allen further testified at trial that he never received any off-the-books compensation while at Crazy Eddie. He claimed that his

entire compensation in 1984 when he worked as a store manager, was a weekly paycheck of $300 or $400, and an annual salary of $21,000. Yet he drove a Jaguar (which he may or may not have leased himself), and was married with three children, two of whom were in private school with a tuition of approximately $25,000. Moreover, on a purported $21,000 annual salary, Allen was also able to take a three-day trip to Las Vegas where he proceeded to lose $19,000 playing keno. Allen's denial of off-the-books compensation is unequivocal, and that is his right. The facts, however, suggest otherwise.

### (3) *Benjamin Kuszer*

Defendant Benjamin Kuszer ("Kuszer"), a resident of Brooklyn, New York, is Sam M.'s son-in-law. Kuszer owned and operated Benel Distributors, Inc. ("Benel Distributors"), an outfit which sold records and tapes through outlets located inside Crazy Eddie stores under the trade name "Crazy Eddie Record and Tape Asylum". All of its record stores were located inside Crazy Eddie stores, and its corporate offices were located within Crazy Eddie's offices, both in Brooklyn and later in Edison, New Jersey. Benel Distributors paid a portion of the rent and gave Crazy Eddie a percentage of its record sales.

Kuszer's operation of Benel Distributors was symbolic of his position in the Antar family. Benel Distributors was technically distinct from, yet inextricably intertwined with, Crazy Eddie. In a similar vein, Kuszer was technically distinct from the Antar family, as he became a part of the family only through marriage. Yet, the evidence shows that in substance, Kuszer was considered a trusted member of the family. He was, for all intents and purposes, an Antar, and he was permitted to participate in and profit from the business.

Kuszer, like Sam M. and Allen, also contends that his relationship with Eddie nosedived after the New Year's Eve Massacre. Indeed, Kuszer testified that Eddie vowed to "destroy" him for his and his wife's involvement in that episode. Based on this personal enmity, Kuszer contends that he could not

have cooperated with Eddie to carry out the schemes. As with Sam M. and Allen, this court finds that any tension between Eddie and Kuszer was not such that it precluded the latter's participation in or awareness of the frauds perpetrated at Crazy Eddie.

There is evidence that in September, 1984, Eddie paid off the debts of Educators International, Inc., a company owned entirely by Kuszer. Educators International provided recruiting and other services to Eddie's for-profit medical school in the Caribbean, the University of St. Lucia School of Medicine. Although Kuszer assumed that Eddie was the real owner of the company, the fact remained that Kuszer owned all of the company's stock. As of May 31, 1984, Educators International and the medical school owed Crazy Eddie approximately $1 million. Although Eddie could have left Kuszer liable for Educators International's debt, Eddie repaid all of the company's debt personally out of his proceeds from Crazy Eddie's IPO, almost nine months after the supposed beginning of the family feud.

Kuszer testified for two days at trial. He came across to this court as a mild-mannered person who worked hard at gaining the trust and respect of the Antars. To gain that trust, Kuszer did what he was told, and he was willing to break the law. As will be discussed further below, Kuszer made two trips to Israel at Sam M.'s request to deposit cash. In 1980, Kuszer transported $600,000 to Israel and deposited the money into Sam M.'s account at Bank Leumi.[6] In 1983, Kuszer deposited $1 million into the Israeli account. He did so while knowing that he was required to report to United States Customs the fact that he was carrying more than $10,000 in cash. He was willing to break the law "because my father-in-law asked me to." *Testimony of Benjamin Kuszer*, Vol. 17.36. Under questioning by the court, Kuszer admitted that he would act in the very same manner today:

> THE COURT: If your father-in-law asked you to violate the law in any other way, would you do that?

THE WITNESS: No, sir.

THE COURT: Why the change of heart?

\* \* \* \* \* \*

THE WITNESS: Well, the best answer I could give you, sir, if this was his money and I was just carrying his money. I didn't look at it as an active part of doing something that I shouldn't have. Regrettably that was probably where I was coming from.

THE COURT: If your father-in-law asked you to keep something to yourself in transactions involving himself with respect to his money, would you act in the very same way as you did on those two occasions when you transported money surreptitiously to Israel?

THE WITNESS: If it was his money, yes, sir.

*Id.* at Vol. 17.36–37.

The trust placed in Kuszer by the Antars was well-founded, as his testimony at trial and in prior depositions revealed that he has attempted to protect other members of the Antar family. For instance, when Kuszer traveled to Israel in 1980 to deposit the $600,000 into the account controlled by Sam M. at Bank Leumi in Israel, he was accompanied by Mitchell and Solomon Antar. At his deposition (which occurred shortly before Mitchell was to be sentenced), and again at trial, Kuszer testified that he did not know whether Mitchell or Solomon Antar knew he was carrying $600,000 and that he could not recall any discussion with them concerning the money or where it was to be deposited. It is implausible, however, that Mitchell and Solomon Antar did not know Kuszer was transporting $600,000 on their trip to Israel. The money belonged to and was being deposited at the request of Sam M., Mitchell's father, who paid for the trip. Mitchell was also a key participant in the Crazy Eddie frauds. It is equally implausible that Kuszer would have concealed the $600,000 from Solomon Antar, who himself made two cash de-

---

**6.** As will be discussed further below, Sam M. opened other secret accounts at Bank Leumi in Israel.

posits totaling $1 million into the very same account.

Kuszer gave similarly implausible and evasive testimony about his second trip to Israel in May, 1983, when he deposited $1 million in cash. Kuszer was accompanied on this trip again by Mitchell. At his March, 1994 deposition, Kuszer testified that he did not know whether Mitchell knew that he was transporting $1 million in cash. At trial, Kuszer backtracked slightly and testified that Mitchell "might have helped him carry the $1 million":

Q. Now, on your million-dollar trip, Mr. Kuszer, only Mitchell Antar went with you, isn't that true?

A. Yes, sir.

Q. And the million dollars of cash that you were carrying, that wouldn't fit all in one suitcase, would it?

A. I don't recall.

Q. Isn't it a fact that Mitchell helped you carry the million dollars in cash on that trip?

A. I don't know if it was a fact or not, but he might have.

Q. He might have?

A. Yes.

*Testimony of Benjamin Kuszer,* Vol. 17.38.

Kuszer was also evasive about the cash skimming at Crazy Eddie. At trial, Kuszer denied that he was aware that cash was being skimmed at Crazy Eddie from 1974 to 1978. However, as his co-defendant Sam M. testified, Kuszer "must have known that we did skim money prior to '76." *Testimony of Sam M. Antar,* Vol. 11.103.

Unlike Allen, who gained trust within the family because of birthright, Kuszer earned his trust because he was hard working and reliable. Ultimately, this trust placed in him by the Antars may not have been in Kuszer's best interest.

### (4) *The Relief Defendants*

Relief defendants Rori Antar, Sam A. Antar, and Michelle Antar are Allen's children. Relief defendants Adam Kuszer, Sam Kuszer, and Simon Kuszer are Kuszer's children. All are the grandchildren of Sam M. (hereinafter referred collectively as "Relief Defendants"). It is undisputed that the Relief Defendants received the monetary proceeds from the sale of Crazy Eddie common stock sold on their behalf by Eddie Antar in March, 1985.[7]

The Relief Defendants neither participated in nor were aware of the frauds perpetrated at Crazy Eddie. Their only connection to this case is based on the sale of stock held on their behalf by Eddie pursuant to the Uniform Gifts to Minors Act.

### (5) *Other Key Players*

While not parties to this action, certain other individuals, who played varying roles in both Crazy Eddie and the allegedly fraudulently schemes perpetrated in that organization, must be mentioned.

Eddy Antar ("Uncle Eddy") was Sam M.'s brother. At the time of Crazy Eddie's IPO, Uncle Eddy was a member of the company's Board of Directors and Treasurer. Uncle Eddy received a grant of immunity from prosecution pursuant to an agreement with the United States Attorney for the District of New Jersey.

While I found Uncle Eddy to have been a generally credible witness at trial, I also had the impression that he was not as closely involved in the operations at Crazy Eddie during the relevant time period as some of the others. First, while Uncle Eddy admitted that he, Sam M., and others skimmed cash from Crazy Eddie in the 1970's, his testimony reveals that he cut back on his participation sometime around 1978, when he suffered a heart attack. Second, Uncle Eddy also had another business in Bridgeport, Connecticut, to which he attended, particularly during the busy Christmas season. As will be discussed further below, much of the cash skimming at Crazy Eddie occurred during the Christmas season. And third, Uncle Eddy's testimony was limited specifically to cash skimming prior to the company's IPO in 1984. He did not testify as to the various

---

**7.** As discussed more fully below, what is disputed is whether Allen and Kuszer—who maintain that they knew nothing of the alleged frauds which occurred at Crazy Eddie—directed the sale of that stock or whether the entire transaction was orchestrated by Eddie.

frauds which allegedly took place after 1984. In sum, I found Uncle Eddy to be a generally honest man, who did his job as he was told, primarily by Eddie and Sam M., and kept himself out of much of the personal tensions within the family. That being said, it is also clear to this court that Uncle Eddy was simply not a major player in the numerous schemes perpetrated at Crazy Eddie, and his testimony must be assessed accordingly.

Sam E. Antar ("Sam E."), Uncle Eddy's son and Sam M.'s nephew, testified extensively at trial about the roles played by Sam M., Allen, and Kuszer in the alleged fraudulent schemes, as well as their awareness thereof, at Crazy Eddie. Growing up, Sam E. lived approximately one mile from Sam M.'s house and was close to all three of Sam M.'s sons. When he was twelve years old, Sam M. gave Sam E. his first job. Sam M. and Eddie also provided Sam E. with financial support to attend college, and in 1979, Sam E. graduated from Baruch College with a bachelor's degree in business administration and public accounting. He then became a Certified Public Accountant. Sam E. began working full-time at Crazy Eddie in June, 1984 as comptroller and head accountant. He was then promoted to Chief Financial Officer and Executive Vice President in August, 1986, and was elected to the Board of Directors in December, 1986. His employment at Crazy Eddie was terminated on November 6, 1987.

In August, 1991, Sam E. entered into an agreement with the United States Attorney to plead guilty to a criminal information in connection with his activities at Crazy Eddie. He subsequently pled guilty to charges of conspiracy to commit securities fraud, conspiracy to commit mail fraud, and obstruction of justice. He was sentenced to six months home detention, 1,200 hours of community service, and fined $10,000. Sam E. completed his sentence, and in June, 1997, completed his period of supervised release. As part of his plea agreement, Sam E. agreed to testify about the allegedly fraudulent activities perpetrated at Crazy Eddie and to cooperate with the SEC in its investigation and prosecution of this and other cases involving Crazy Eddie.

As noted above, Sam E. testified extensively at trial, and as far as live testimonial evidence is concerned, the SEC relied heavily on Sam E. He is not, however, without his credibility problems. He has, for instance, admitted to lying to the SEC in depositions. Moreover, in 1987, when Eddie was locked in a bitter matrimonial dispute with his first wife, he and Sam E. swore out a complaint against Lillian Rosen, Eddie's mother-in-law, charging her with stealing approximately $7,500 from Crazy Eddie. In testifying before the grand jury investigating the charge, Sam E. intentionally misled the panel upon Eddie's instruction. Not to be overlooked in assessing Sam E.'s credibility is the fact that he was a major player in developing and carrying out the web of fraudulent activities at Crazy Eddie.

Thus, this court is not blind to Sam E.'s checkered history in this affair. Yet, this court was also able to assess Sam E.'s demeanor and credibility, as it pertains to this case, over the seven days he testified at trial. I found him to be intelligent and articulate, and for the most part, he provided a coherent explanation of what occurred at Crazy Eddie. His evident intelligence allowed him to grasp what was occurring at the company even at a relatively young age. And by the time he had finished college, Sam E. was armed with sufficient skills in both business and accounting to rise swiftly through the Crazy Eddie hierarchy once he began to work there. There is no doubt that Sam E. was right in the thick of things as far as the frauds perpetrated at Crazy Eddie are concerned. While this may arguably be germane in assessing his credibility, it also reveals that Sam E. was in a position to know what was happening and who was involved. Such is the nature of conspiracies. In short, I found Sam E.'s testimony provided at trial to have been truthful.

As noted previously, Eddie and Mitchell pled guilty in the criminal action in 1996 and are currently incarcerated. They were not called to testify in this case. The defendants make much of this fact, as well as the fact that the SEC did not call many other poten-

tial witnesses who, based on their participation in various phases of the fraudulent activities at Crazy Eddie, presumably possessed knowledge of relevant facts. The defendants therefore ask this court to draw the conclusion that by failing to call these witnesses, the SEC knew or strongly suspected that these individuals would not implicate Sam M., Allen, or Kuszer in the frauds.

This court will not draw such an adverse inference against the SEC. I note that the defendants themselves did not call these witnesses, even though they had the same subpoena power to compel their testimony. Just as this court would not infer from this that these witnesses, if called by the defendants, would have implicated them in these frauds, I cannot draw the opposite conclusion. The SEC's case must stand or fall on the strength or weakness of the evidence actually presented by them. This court will not engage in speculative interpretation of the SEC's trial strategy to divine what a potential witness's testimony might have been and how that presumed evidence might have impacted on this case.

#### (6) *Sales of Stock*

At issue in this case are allegations that the defendants sold Crazy Eddie stock while in possession of material, nonpublic information in violation of the federal insider trading laws. The stock transactions at issue in this case are provided below.

### Sam M.

| Date | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| Sept., 1984(IPO) | 300,000 | $ 8.00 | $2.4 million |
| March, 1985 | 150,000 | $21.00 | $3.15 million |
| Oct., 1985 [8] | 450,000 | $12.00 | $5.4 million |
| Feb., 1986 | 60,000 | $26.00 | $1.56 million |
| March, 1986 | 200,000 | $26.375 | $5.275 million |
| Sept., 1986 | 25,000 | $33.75 | $843,750 |
| July, 1987 | 150,000 | $ 6.02 [9] | $903,125 |
| TOTALS | 1,335,000 | — | $19,531,875 |

### Allen

| Date | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| March, 1985 | 50,000 | $21.00 | $1.05 million |
| Feb., 1986 | 20,500 | $22.00 | $451,000 |
| Dec., 1986 | 200,000 | $12.00 | $2.4 million |
| TOTALS | 270,500 | — | $3,901,000 |

### Kuszer

| Date | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| March, 1985 | 50,000 | $21.00 | $1.05 million |

### Relief Defendants

| Date | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| March, 1985 | 150,000 | $21.00 | $3.15 million |

---

#### B. *Crazy Eddie: Background*

Crazy Eddie, which had become a major retail consumer electronics outfit in the tri-state area, had relatively modest beginnings. In 1969, Sam M., Eddie, and Aaron Gindi, Sam M.'s nephew, opened "Sights and

8. The October, 1985 sale was a private transaction in which Sam M. sold the 450,000 shares to Bear, Stearns & Company.

9. The July, 1987 stock transaction actually represents a number of individual transactions by Sam M. over a one week period beginning on July 2, 1987 and ending on July 9, 1987. During this period, the price per share of Crazy Eddie stock fluctuated between $6.125 and $6.00. The $6.02 per share price is therefore a composite figure, which takes into consideration the price fluctuation and the fact that Sam M. sold varying numbers of shares throughout the one week period. The $6.02 per share figure should therefore not be considered the actual price of the shares sold by Sam M. during this period.

Sounds," a retail audio equipment store, on Kings Highway in Brooklyn, New York. The business was incorporated as ERS Electronics, Inc. Eddie eventually bought out Aaron Gindi's interest in Sights and Sounds and thereby acquired a two-thirds interest in the business, with Sam M. owning the remaining one-third.

There is some dispute as to how well the business performed. While all parties acknowledge that business at Sights and Sounds was at first marginal, they disagree as to whether it continued to be marginal throughout its life. Sam M. testified at trial that the business did grow when it began to sell merchandise at prices below that charged by competitors and when it began to advertise. The SEC disputes this. What is clear through Sam M.'s own testimony, however, is that by the end of 1972, Sights and Sounds became unable to pay back its creditors—owing, for example, $400,000 to trade creditors alone—and by December, 1972, had ceased operations.

Sam M. decided then to take advantage of the bankruptcy laws. He testified at his deposition that he had "read the bankruptcy laws" and "found the greatest loophole in the world." *Deposition Testimony of Sam M. Antar*, November 22, 1988 at 33.[10] This "loophole" was that "any creditor that gets paid within a period of 120 days is considered a preferential credit." *Id.* Thus, "if I went bankrupt today, anybody that I paid money in the last four months now has to throw it back to the pot." *Testimony of Sam M. Antar*, Vol. 13.51.

Accordingly, Sam M. formed a new corporation, "Ultralinear Sound Corporation," to succeed ERS Electronics and operate the Sights and Sounds business. In 1974, Sights and Sounds changed its name and began doing business as "Crazy Eddie." The business expanded from one store in 1973 to three stores in 1976. The second Crazy Eddie store opened in Syosset, New York, and the third opened in Manhattan in 1975. In 1975, Crazy Eddie, Inc., was incorporated to be the parent company of the three Crazy Eddie stores.

In 1976, a fourth Crazy Eddie store opened on Fordham Road in the Bronx, New York. The opening of the Fordham Road store was simply the first in a period of rapid expansion throughout the tri-state region. By 1984, there were thirteen Crazy Eddie stores scattered throughout New York, New Jersey, and Connecticut.[11]

### (1) *Cash Skimming: The Early Years*

Rapid expansion was not the only business strategy carried out by the Antars. As early as 1971, Sam M. and Eddie began skimming cash[12] from Sights and Sounds. Sam E. testified at trial that Sam M. and Eddie discussed "that some money was put aside for them that was not going to be reported to the Government; that would not be deposited in the store's receipts for that day." *Testimony of Sam E. Antar*, Vol. 1.73, 1.75. He also testified that in accordance with their interests in the business, Eddie and Sam M. received two-thirds and one-thirds, respectively, of the skimmed cash. This cash was used for personal[13] use and to pay employees "off the books" in cash.

10. This deposition testimony was taken in the matrimonial action initiated by Debbie I against Eddie in the Supreme Court of New York.

11. In 1977, a store was opened in Paramus, New Jersey. Another Crazy Eddie store was opened the following year in East Brunswick, New Jersey. In 1979, two stores, located in Union, New Jersey and Hartsdale, New York, respectively, were opened. Between 1980 and 1981, two additional Manhattan stores were opened. In 1983, the expansion continued with two new stores, one in Norwalk, Connecticut and the other in Totowa, New Jersey. Finally, in 1984, a

Crazy Eddie store was opened in Nesconset, New York.

12. The term "skimming" refers to a process by which cash proceeds of sales are not deposited or recorded on the company's books and records, but instead are either used for the company's off-the-books payroll or taken for personal use.

13. For instance, Sam M. was apparently a gambler and frequented Caesars Palace in Las Vegas, Nevada. His wife had a line of credit at Caesars Palace between $30,000 and $100,000. Upon the instructions of Sam M., Eddie, Mitchell, and

In 1974, Sam M. hired Uncle Eddy to work at Sights and Sounds. His duties were to receive daily store receipts, make deposits, pay creditors, handle the payroll, and maintain the company's books. These books included records of cash skimmed to pay employees, enrich various members of the Antar clan, and avoid paying taxes. For the first few months on the job, Uncle Eddy worked out of Sam M.'s house in Brooklyn, where he would receive the day's receipts—checks, charges, and cash—from Sights and Sounds. These receipts were delivered by Kuszer, Mitchell, or Eddie. Based upon the instructions given to him by Sam M. or Eddie, Uncle Eddy would then deposit only as much money as was needed to cover any outstanding checks. He used a portion of the remaining cash for payroll, which in part, was paid out in cash.[14] The rest of the cash would then be placed in a file cabinet in Sam M.'s house. Uncle Eddy testified that in 1974, he was skimming between $5,000 and $10,000 a week. Uncle Eddy understood that cash was held back and not deposited to avoid paying taxes. When Uncle Eddy was away, the responsibility for maintaining the books was given to Kuszer.

The cash-skimming procedure described above changed somewhat when Crazy Eddie opened an office in Brooklyn in 1974. From that time until 1978, Uncle Eddy would receive the daily receipts at his own home in Brooklyn after the stores closed. Beginning from approximately 10:30 p.m. and continuing to midnight, store managers from each store dropped off a bag with the day's checks, charges, cash, and a register receipt. In 1974, Uncle Eddy would receive the daily receipts from only the Sights and Sounds store, but by 1978, he was receiving receipts from the six Crazy Eddie stores then in existence.

Each day, Uncle Eddy took the checks and charges to the office, gave them to the bookkeepers, deposited whatever cash was needed to cover outstanding checks, put the skimmed cash in an attache case and brought it home. When the attache case became full, Uncle Eddy put the cash under the radiator of his house. Uncle Eddy testified that on one occasion, he had approximately $200,000 to $250,000 of skimmed cash under his radiator. When the cash accumulated under the radiator, Uncle Eddy brought it to Sam M.'s house and gave him the cash. At times when Sam M. was not at home, Uncle Eddy gave the cash to either Kuszer or Mitchell. On some occasions, Eddie had Uncle Eddy deliver the cash directly to him.

Sam M. and Eddie closely monitored the cash skimming scheme. Eddie called Uncle Eddy on almost a daily basis, and sometimes twice a day, to ask him how well they were doing, how much cash they had at the time, or who Uncle Eddy had paid. Sam M., while maintaining that he did not have any responsibilities for day-to-day operations, focusing instead on his numerous other businesses, does not dispute that he was involved in the cash skimming at Sights and Sounds from as early as 1971. However, Sam M. contends that he stopped skimming cash from Crazy Eddie in 1976, and that from that time forward, he neither participated in nor was aware of any cash skimming at Crazy Eddie. His assertions on this point will be addressed later in this opinion.

Uncle Eddy also handled the finances for Benel Distributors, including its off-the-books payroll. With the cash left over, he recorded the excess amount in a book and mingled the money with the cash skimmed from Crazy Eddie. Before Crazy Eddie went public in 1984, Sam M. and Eddie instructed Uncle Eddy to destroy the Benel

---

Kuszer, cash was also distributed to various family members, including Eddie's wife, his mother-in-law Lillian Rosen, Allen, and Mitchell. Some of the cash was used to renovate the homes of Allen, Kuszer, and Mitchell.

**14.** Evidence was presented that only a portion of each employee's salary was reflected on the company's books. At first, Uncle Eddy paid the employees entirely in cash on a weekly basis. Later, employees received a paycheck plus an off-the-books cash payment. Sam M., Eddie, or Mitchell instructed Uncle Eddy how much to pay the employees.

Distributors cash-skimming records, which he did.

### (2) *Sam M.'s Secret Bank Accounts in Israel*

In June or July, 1978, Sam M. and Uncle Eddy, along with their wives, traveled to Israel. Uncle Eddy testified that on that trip, Sam M. went to a seminar sponsored by Bank Leumi in Tel Aviv, Israel, in which he learned that the bank offered secret bank accounts that would not be reported to the United States Internal Revenue Service. Thereafter, on October 28, 1979, Sam M. opened a secret bank account, number 31332, at Bank Leumi in Israel. The names on the account were Sam M., his wife Rose Antar, Eddie, and Mitchell. As an added precaution to guard against any disclosure of information concerning this account, Sam M. instructed Bank Leumi not to send him any account statements or other mail.

Sam M.'s opening deposit into the new secret account was $25,100 in cash, which he transported to Israel with four relatives. Each relative carried $5,000 to avoid the reporting requirement for the foreign transport of currency.

After the 1979 Christmas season, Sam M. and members of his family began depositing skimmed cash into the secret account in Israel. These deposits continued until June, 1983. In April, 1980, Kuszer transported $600,000 in cash to Israel and deposited the sum into account number 31332. Kuszer was accompanied on this trip by Mitchell and Solomon Antar, the general counsel of Crazy Eddie. Kuszer suspected that the bank account was an "illegal account" that was "not to be reported to the Government," and believed that at least some of the money came from Crazy Eddie.

In June, 1980, Sam M. traveled to Israel, again with Uncle Eddy and their wives, and deposited $400,000 in cash into account number 31332. Based upon Sam M.'s instructions, Uncle Eddy took approximately $215,000 ($200,000 of which came from underneath his radiator) in one hundred dollar bills. Uncle Eddy testified at trial that all of the money had come from Crazy Eddie stores.[15]

On August 29, 1980, Solomon Antar deposited $400,000 in cash into account 31332. This money came from Sam M. On October 7, 1980, Sam M. himself deposited the sum of $225,000 into the account, and on April 24,

---

15. Under cover letter dated January 27, 1998, the defendants submitted various documents from the Israeli government which purportedly showed that Uncle Eddy did not travel to Israel in June, 1980, but only in October, 1980. The defendants moved to admit these documents, which are in Hebrew, as well as purported translations of these documents, into evidence. This court denies the defendants' motion.

First, the foreign documents are unauthenticated and uncertified, in violation of Rules 901 and 902(3) of the Federal Rules of Evidence. Moreover, there is no indication from the defendants as to who may have prepared the purported translation of the documents into English, or whether the translator is qualified. *See* Federal Rule of Evidence 604.

Second, according to the purported translation, it appears that the defendants did not request the documents from the Israeli Border Control until January 11, 1998, approximately one year after the parties were required by this court to identify all of their trial exhibits in the Final Pretrial Order. The date of the request was also two and a half months after the trial in this matter was concluded, and over a month after the parties had submitted their proposed findings of fact and conclusions of law. Clearly, the plaintiff had no opportunity to investigate either the authenticity or veracity of the documents in question, and thus, admitting them at this late date would severely prejudice the plaintiff.

And third, even if this court were to admit this evidence, it would be of little relevance to the important substantive issues in this case. The defendants seek to admit this evidence to undermine Uncle Eddy's credibility. However, the documents show, if anything, that both Sam M. and Uncle Eddy were mistaken as to precisely when they traveled to Israel together to deposit funds into the secret account. Sam M. testified that Uncle Eddy accompanied him in April, 1981, while Uncle Eddy testified that it was June, 1980. The Israeli Border Control documents suggest, however, that Sam M. and Uncle Eddy were both in Israel between October 6 and October 23, 1980, which would correspond to a deposit made by Sam M. on October 7, 1980. The precise date on which they may have been in Israel at the same time is not as significant as the fact that it happened. Moreover, there is no dispute that in June, 1980, $400,000 in cash was deposited into the secret account at Bank Leumi in Tel Aviv.

1981, he deposited an additional $605,010 in cash into the account. On September 10, 1981, Solomon Antar deposited $600,000 into the account. On April 20, 1982, Sam M. deposited $1,060,000 in cash into the account. Solomon Antar accompanied Sam M. on this trip because, as Sam M. put it, "[a] million dollars is too much in one suitcase."

In May, 1982, Sam M. added Kuszer and Debbie I as signatories to the account, and as such they had the right to withdraw money out of the account.

On May 12, 1983, Kuszer deposited $1 million into the account. The trip to Israel was paid for by Sam M. Soon thereafter, on May 29, 1983, Eddie made a $600,000 cash deposit into the account.

In total, Sam M. and his family deposited the sum of $6,145,110 in skimmed cash into their secret accounts in Israel. By himself, Sam M. deposited skimmed cash totaling $2,945,110.

### (3) *Account 12245*

On June 29, 1983, Sam M. and his wife opened account number 12245 at Bank Leumi in Tel Aviv and immediately transferred $2,813,677 from account number 31332 into the new account. In addition to this transfer, Sam M. deposited $600,000 into the new account. Account 12245 was also a secret account, the existence of which was not reported to the United States Internal Revenue Service.

On or about February 6, 1984, Eddie learned about Sam M.'s transfer of the $2.8 million. According to the testimony of Sam M., Eddie became very angry because he believed that Sam M. had transferred too much money into the new account. *See Testimony of Sam M. Antar*, Vol. 11.71. Sam E. testified that the money in account 31332 was to be divided according to their respective interest in Crazy Eddie; that is, Sam M. was to transfer one-third of the funds and Eddie was to retain two-thirds. Accordingly, on August 21, 1984, Sam M. transferred $964,884 from account number 12245 to a new account opened by Eddie at Bank Leumi, account number 13299. With this adjust-

ment, Sam M. was left with $2,802,222 in account number 12245, which reflected his one-third share of the $8,409,289 in principal and interest earned on the skimmed cash in Israel. Only Sam M. and his wife Rose were signatories to account number 12245, and thus, the transfer of $964,884 from that account certainly could not have been accomplished without their approval.

### C. *The 3-2-1 Theory of Cash Skimming*

The discussion above regarding the cash skimming that went on at Crazy Eddie and its predecessor corporations is more properly viewed as a preclude to what is at the heart of this case. Indeed, this case is not simply about cash skimming, and the defendants, for their part, do not dispute that extensive cash skimming occurred at Crazy Eddie, at least prior to 1976. At the heart of the SEC's case—as it relates to Crazy Eddie's IPO in 1984—are allegations that beginning in 1979, both Eddie and Sam M. developed a goal of taking the company public sometime in the future. To achieve this goal, the SEC alleges that between 1979 and 1984 less and less cash was skimmed each year from Crazy Eddie. By reducing the skim each year, this "3-2-1" theory of cash skimming would provide the appearance to the public that Crazy Eddie was growing in profitability, thereby making its stock much more attractive. The defendants contend that they neither participated in nor had any knowledge of such a scheme. Indeed, they deny that they even knew that cash skimming was occurring at Crazy Eddie after 1976.

The evidence in this case shows that beginning in or about 1979, Sam M. and Eddie had a long-term goal of making Crazy Eddie a publicly held company. They believed that to make Crazy Eddie stock ultimately appear more valuable to the public, they would need to show growth and not simply a healthy profit margin. Accordingly, Sam M. and Eddie devised a scheme, first implemented during the Christmas season of 1979, whereby they would create artificial growth in the company's pre-IPO earnings by skimming less cash each year. At trial, Sam E. testi-

fied extensively about the "3–2–1" theory of cash skimming between 1979 and 1984:

Q. Mr. Antar, focusing your attention on the fiscal year 1980, can you tell the Court the amount of cash that was represented to you that was skimmed from the Crazy Eddie stores in fiscal year 1980?

\* \* \* \* \* \*

A. I learned from at least Sam M. Antar that we skimmed over $3 million in cash from Crazy Eddie that fiscal year ended May 31st, 1980.

Q. Who told you that?

A. Sam M. Antar and it was discussed with other people also.

Q. And can you describe how you were present during these discussions?

A. I lived right next door to Sam M. Antar's house. Ben Kuszer, who lived upstairs would be there; Mitchell Antar would be there; Allen Antar would be there, their wives would be there. It would not be in just one discussion. It would be during the year it would come up from time to time. Not everybody would be there during every single discussion. Sometimes one person will not be there, sometimes two would not be there. But it was a subject that came up from time to time, if they skimmed over $3 million from Crazy Eddie for that fiscal year, that was the amount of money taken out of Crazy Eddie and skimmed.

Q. Where did these conversations take place?

A. In Sam M. Antar's house.

\* \* \* \* \* \*

Q. And did you learn the amount that was skimmed in fiscal year 1981?

A. Yes, I did.

Q. And how did you learn that?

A. Again, I was over the house. I was constantly over their house.

THE COURT: Whose house?

THE WITNESS: Sam M. Antar's house, various members of his house were present, like Mitchell, Sam M. Antar, Eddie Antar, Ben Kuszer, their wives were present. I learned two and a half million dollars was skimmed approximately during that fiscal year ending May 1981.

Q. Who told you?

A. Sam M. Antar was the primary person that told me. However, I heard it from time to time form the various other individuals like Ben Kuszer, Mitchell Antar and Eddie Antar, and also in the previous year I heard it from those various individuals also.

*Testimony of Sam E. Antar,* Vol. 1.143–145. Sam E. provided similar testimony for fiscal years 1982, in which $1.5 million was skimmed from Crazy Eddie, and 1983, in which $750,000 was skimmed.

Upon questioning by this court, Sam E. provided the reasoning behind the skimming.

THE COURT: Was there any reason given to you by any of the individuals as to why a lesser amount had been allegedly skimmed?

THE WITNESS: Yes.

THE COURT: What was that reason and who said it—first of all, who said it to you? Who gave you that explanation?

THE WITNESS: I received the information from more than one individual, at least two.

THE COURT: Give me the two.

THE WITNESS: Sam M. Antar and Eddie Antar, his son.

THE COURT: What did the two gentlemen tell you?

THE WITNESS: In the late 1970's, '79, early 1980, they had a goal of taking Crazy Eddie public one day.

THE COURT: An IPO?

THE WITNESS: They wanted the company to grow and eventually became a public corporation. They didn't know it was going to become a public corporation in '79 or '80. It was only a goal, only a dream, but that is what they wanted to ultimately do.

It was represented to me by them that they wanted to skim money each year towards getting ready to become a public

company, the main reason that was represented to me by Eddie and Sam M. Antar—in fact, I participated in discussions. My input was included in those discussions regarding these matters, that by skimming less money each year, what you are doing also is you are helping your earnings grow by skimming less money each year.

So what you are doing is in preparation for going public, you are skewing your earnings and giving yourself an extra advantage of earnings. Not only would you be growing if you do more business, but your earnings would also grow as a result of skimming less money, so you have that added advantage.

THE COURT: And the strategy, if adopted, based on what I hear you saying, would improve the image of this company as an attractive company to go public?

THE WITNESS: Yes.

Growth companies and this was discussed at these discussions—growth companies is what get premium prices on Wall Street.

*Id.* at Vol. 1.147–148. I found Sam E.'s testimony to have been credible on this point.

Accordingly, the "3–2–1" process of cash skimming resulted in the Crazy Eddie net income [16] figures showing growth rather than stable profitability:

| Date Fiscal Year | Number of Shares Amount of Skim | Price/Share Gross Proceeds Reported Net Income/True Net Income |
|---|---|---|
| | (Approximately) | |
| 1980 | $3 million | $1.7 million/$4.7 million |
| 1981 | $2.5 million | $2.3 million/$4.8 million |
| 1982 | $1.5 million | $3.4 million/$4.9 million |
| 1983 | $750,000 | $4.6 million/$5.35 million |

Thus, by reducing the skim each year, the members of the Antar family involved in this scheme created the appearance that Crazy Eddie was not only profitable, but that it also grew in profitability each year.

The defendants dispute the "3–2–1" theory of cash skimming in several respects. They deny that cash skimming occurred at Crazy Eddie after 1976. The defendants also characterize as utterly incredible the SEC's theory that Eddie and Sam M., a full three to four years prior to the IPO, could envision taking the company public and then implement a highly disciplined scheme through which they, and members of their family, gradually reduced their cash skimming over the time period. And third, the defendants contend that even if cash skimming under the "3–2–1" theory did occur, they neither

participated in nor were aware of the scheme. This court is unpersuaded by defendants' contentions.

(1) *Cash Skimming After 1976*

The defendants first contend that the SEC has failed to prove by a preponderance of the evidence that cash skimming occurred after 1976. In support, they point to the testimony of Uncle Eddy, who as the family member responsible for maintaining the internal financial and accounting controls at Crazy Eddie, testified that with one exception he never found the type of discrepancy in the records which would have been evident had cash skimming occurred.

At trial, Sam E.[17] testified that on the instructions of Eddie, Kuszer, Mitchell, and Sam M., he went to the various Crazy Eddie

---

16. The net income figures were calculated before pension contribution and income taxes were included.

17. Evidence concerning the fact and extent of cash skimming at Crazy Eddie post–1979—as it relates to the "3–2–1" theory of skimming—is derived primarily from the testimony of Sam E.

As noted above, prior to 1978, Uncle Eddy was intricately involved in the cash skimming process. In that year, however, Uncle Eddy suffered a heart attack which prevented him from performing most of his previous duties. From the 1979 Christmas season onward, Sam E., Uncle Eddy's son, stepped into his father's role.

stores to pick up the daily store receipts during the Christmas season and brought the money back to the homes of Sam M., Mitchell, or Kuszer. It is here that the specific cash skimming mechanism is significant and where the defendants focus their primary attack on the testimony of Sam E. Sam E. testified that when he visited a store during the Christmas season to pick up the daily receipts, the store manager would count the cash in his presence. The amount of cash counted would then be memorialized on a document called a "summary sheet". He would then take the cash, the summary sheet, and the store register tape, called a "Z-out sheet," along with the checks and charges, to Sam M.'s home. The Z-out sheet automatically recorded every sale which was rung up on that register for that day. Sam E. acknowledged that as a general matter, the Z-out sheet, which was automatically generated by the cash register, should reconcile with the summary sheet with respect to the amount of cash sales at the store.

The skim actually took place after Sam E. brought the daily receipts to Sam M.'s house, where the summary sheets were altered to show less cash being generated for that day. Sam E. acknowledged that once the summary sheets were altered, a discrepancy would arise between it and the Z-out sheet. Sam E. further testified that Uncle Eddy had the responsibility of supervising the reconciliation of the Z-out sheets and summary sheets as part of Crazy Eddie's internal controls designed to detect employee theft. Accordingly, if there were a discrepancy between the Z-out sheet and the summary sheet, Uncle Eddy was charged with detecting such inconsistencies. Uncle Eddy testified at trial, however, that he never discovered, with one exception, a major discrepancy between the summary sheets and the Z-out sheets. That one exception was when he discovered that $10,000 or $15,000 was not accounted for. Uncle Eddy testified that apart from this one episode he never discovered any major discrepancy between the Z-out sheets and the summary sheets, particularly discrepancies of $50,000 or more.

While Uncle Eddy's testimony facially seems at odds with the testimony of Sam E., it does not provide a basis for this court to reject Sam E.'s testimony that extensive cash skimming occurred at Crazy Eddie from the 1979 Christmas season forward. It must be remembered that Uncle Eddy had his own children's wear business in Connecticut. He worked at that store between ten and twelve days during each Christmas season. Accordingly, he would not be present for a number of days to detect any discrepancies. During his absence, Kuszer conducted the reconciliations between the Z-out sheets and the summary sheets. Kuszer also denied that there was ever a large discrepancy when he was responsible for the reconciliations. Kuszer's credibility, however, is in grave doubt.

Moreover, it is evident to this court that the system of internal controls at Crazy Eddie, ostensibly supervised by Uncle Eddy, left much to be desired. Uncle Eddy himself testified that Z-out sheets were not entirely accurate, and thus, any reconciliation done with the use of such Z-out sheets was very difficult. Even if it is assumed that the Z-out sheets and the summary sheets could be used to accurately reconcile the cash receipts, the primary purpose of this process was to ensure that other employees of the company were not stealing money. It was not used to guard against cash skimming by Eddie, Sam M., and other close family members. Thus, as Sam E. testified, the value of utilizing this reconciliation process was extremely limited in revealing cash skimming done by members of the Antar family since any such controls could be and were customarily overridden by either Eddie or Sam M.:

A. ... this was not a big public corporation where there was a bureaucracy with checks and balances. It was a close-knit control, Eddie and his father. If they wanted to circumvent procedures and this is how they wanted, that is how things were done. No questions asked.

*Testimony of Sam E. Antar*, Vol. 5.106.[18]

Uncle Eddy's testimony in this regard must also be placed in its proper context.

---

18. In their further efforts to undermine the credibility of Sam E. with respect to his testimony

concerning cash skimming from 1979 through 1984, the defendants introduced the testimony of

Uncle Eddy testified that from 1979 through 1984, he participated in the cash skimming, albeit only from two stores. His cash skimming participation was limited due to his heart attack in 1978. Uncle Eddy testified that he received the checks, charges, and bank deposit slips from the Crazy Eddie stores in his office on Coney Island Avenue, along with a "reconciliation form" prepared by the store managers. He continued to receive cash from the two stores, $3,000 a day from the Paramus store for six days a week, and $2,000 a day from East Brunswick for seven days a week, for a total of $32,000 a week. Thus, the fact that Uncle Eddy testified that he did not recall discovering a major discrepancy between the Z-out sheets and the summary sheets must be viewed within the context of his admitted participation in the cash skimming process. The reconciliation process was simply not implemented to discover incidents of cash skimming, which was occurring throughout this time period by, among others, Uncle Eddy.

Perhaps the most damaging evidence against the defendants, however, is the enormous amounts of money which were being transported to Israel and deposited in various secret bank accounts at Bank Leumi during the relevant time period. As noted previously, by the end of 1983, Sam M. and other members of the Antar family deposited over $6 million into their secret accounts, and this is amply supported by the bank records obtained from Bank Leumi. With the exception of an opening deposit of $25,100 in October, 1979, all other deposits were made after the 1979 Christmas season and up through 1983.

Sam M.'s answer to this is that the money deposited into the secret accounts came not from the cash skimming at Crazy Eddie between 1979 and 1984, but from cash skimming at the company prior to 1976 and his other businesses. It is simply not credible, however, that all of the money deposited into the Israeli secret accounts, a sum totaling over $6 million, was accumulated by Sam M. prior to 1976. As such, the defendants' contention that no cash skimming occurred at Crazy Eddie after 1976 is equally not credible.

With respect to Sam M.'s contention that he skimmed a large amount of cash from his other businesses, this court finds Sam M.'s testimony to be unworthy of credit. It is beyond dispute that Sam M. has been running some type of business since he was nineteen years old, when he opened his first retail store in Ocean City, New Jersey. Over the years, Sam M. engaged in various other businesses, including a retail children's wear store, a store specializing in costume jewelry, and a window-trimming business. Throughout this litigation, however, Sam M. has faithfully provided inconsistent and evasive testimony on the topic of cash skimming from these establishments, and in many instances, he simply lied. His inconsistent testimony throughout this and related litigation renders Sam M.'s present contentions before this court unworthy of belief.

Sam M.'s position—that the money deposited into the secret bank accounts in Israel

Mitch Pinto and Barry Borris, store managers at Crazy Eddie. They testified that Sam E. never approached them and requested cash from their stores. These testimonies do not possess any persuasive authority, however. First, the SEC never took the position that Sam E. did in fact remove cash from stores managed by either Pinto or Borris. Thus, Sam E.'s testimony is not necessarily contradicted by them. Second, Pinto and Borris were certainly not members of the Antar family nor part of their inner circle, and thus, would have no basis to know one way or another whether or to what extent frauds were perpetrated. Third, neither Pinto nor Borris knew that in 1975 or 1976, Sam M. had, by his own account, skimmed approximately $3.5 million from Crazy Eddie stores, or for that matter that any other frauds were perpetrated at the company. And fourth, Sam E.'s testimony concerning cash skimming is corroborated by Edmond Levy, a general manager of a Crazy Eddie store in Paramus, New Jersey and later the district manager for New Jersey. He testified at trial that he also participated in the Christmas cash-skimming from 1977 through 1983. Levy testified that at various times, Uncle Eddy and Kuszer instructed him to separate cash from specified New Jersey stores and bring it to them. Levy then brought the cash to Kuszer, Mitchell, or Sam E. at a Crazy Eddie store in New Jersey or at their homes. Levy testified that he also delivered cash to Sam M. at his home.

came solely from Crazy Eddie prior to 1976 and his other far-flung businesses—appears to be of more recent vintage. In a deposition conducted in January, 1992 in connection with a shareholders' derivative class action suit against, among others, Sam M., he denied that he ever skimmed cash from Crazy Eddie at *any* time:

> Q. Did you ever receive any currency from Crazy Eddie or any of its predecessors?
>
> * * * * * *
>
> A. In what amount?
>
> Q. What's the largest amount of currency that you recall ever receiving on one occasion from Crazy Eddie or any of its predecessors?
>
> A. There's no large amount that I ever remember receiving from Crazy Eddie or its predecessors.
>
> Q. What is the largest dollar amount you do recall?
>
> A. I don't know. Could be 100, $50, expenses for something.

*Deposition Testimony of Sam M. Antar,* January 22, 1992 at 1886. Sam M. also protested: "I never handled any cash. I know nothing about cash. I never went into any store or went to a cash register. I never had anything to do with all these things." *Id.* at 1888–89. He testified to the effect that he did not have "the slightest idea" whether there had been an off-the-books payroll at Crazy Eddie. *Id.* at 1887.

Sam M.'s testimony concerning the amount of cash skimmed from his other businesses and its connection to the amounts deposited into the secret Israeli accounts is equally unworthy of belief. Sam M. testified at trial that by 1970, he had accumulated approximately $500,000 in cash from his various business interests, and by 1976, when he contends he stopped skimming from Crazy Eddie, the total amount of cash skimmed from Crazy Eddie and his other businesses was $5 million. Of this amount $1.5 million was skimmed from his non-Crazy Eddie businesses. Sam M.'s self-serving testimony on these points, however, is belied by the evidence presented in this case.

For example, in 1966, Sam M. opened the "Nogales Discount Center" in Nogales, Arizona, which is located on the United States–Mexican border. This store catered to the large Mexican population and apparently sold a wide array of merchandise. Sam M. testified that the Nogales store was a strictly cash business, and that on every Sunday throughout the year, and on most days during the busy Christmas season, all of the cash receipts at the Nogales store were set aside for his personal use. According to Sam M., he skimmed $300,000 annually from the Nogales store between 1970 and 1976.

Sam M., however, previously provided contradictory testimony on this very subject. In a January, 1992 deposition, Sam M. testified under oath that other than an annual salary, he did not receive any other significant sums of money from the Nogales store:

> Q. Do you recall receiving any other significant sums of money from Nogales Discount Center?
>
> A. No.

*Deposition Testimony of Sam M. Antar,* January 23, 1992 at 2083–84. Sam M. admitted at trial that at his deposition, he made no mention of skimming cash at all from the Nogales store:

> Q. When you were asked if you received any other significant sums of money from the Nogales Discount Center, isn't it a fact that you did not mention one word about skimming operations at the Nogales Discount Center?
>
> A. No, I didn't.

*Testimony of Sam E. Antar,* Vol. 14.12. In addition, despite his testimony that he had skimmed $300,000 annually between 1970 and 1976, he admitted at trial that he closed the Nogales business because he could lease out the space for more money than he was making from the business.

Sam M. also provided inconsistent testimony concerning another business he owned called "Ray's Discount Center," located in Augusta, Georgia:

Q. And the profits from Ray's Discount generally ran about 5,000 or 6,000 a year, right?

A. On one deposition I said that, that is not còrrect.

Q. What is the correct number?

A. What is it?

Q. Yeah.

A. My share, maybe 10 or 15,000.

Q. When you said 5 or $6000 in your prior deposition, were you trying to sort of reduce the amount that you were testifying about?

A. Yes.

*Testimony of Sam M. Antar*, Vol. 13.20–21.

Despite Sam M.'s testimony concerning the enormous amounts of money skimmed from his non-Crazy Eddie businesses, the truth of the matter appears to be that they were not as profitable as he would have this court believe. In his January, 1992 deposition, Sam M. acknowledged with respect to the Nogales store and his other businesses, "[t]hey weren't tremendous successes, but they made a living." *Deposition Testimony of Sam M. Antar*, January 23, 1992 at 2103–04. This was confirmed in part by the testimony of Uncle Eddy who, referring to the Nogales store, testified as follows:

> THE WITNESS: The store was a store that would—and I guess on a big day would do 4 or 5,000 business. It was not anything like the Crazy Eddie store.
>
> \* \* \* \* \* \*
>
> THE WITNESS: So, I think he told me one time something about 10 or $15,000 or $20,000, something like that, that he pulled out of there Christmas time.

*Testimony of Uncle Eddy*,[19] Vol. 8.74. With respect to Sam M.'s business in Charlotte, North Carolina, Uncle Eddy testified that it was a small store that did not do much business. When asked what happened to Sam M.'s other businesses, Uncle Eddy testified that "[m]ost of them went out of business." *Id.* at Vol. 8.58.

The most troubling aspect of Sam M.'s testimony that the enormous amounts of cash he had accumulated were all from his non-Crazy Eddie stores and from Crazy Eddie prior to 1976 is that during the relevant time period, he did not act like a man in possession of such sums of cash. For instance, he testified that by 1970, he had accumulated approximately $500,000 in cash from his non-Crazy Eddie businesses. Yet, in 1969, Sam M. had to borrow money from his sister-in-law to operate ERS Electronics. He further testified that they "borrowed from a lot of people," and "some were repaid and some were not." *Deposition Testimony of Sam M. Antar*, November 22, 1988 at 28–29.

Sam M. further testified that by 1976, he had accumulated a total of $5 million in cash in his Brooklyn home, $3.5 million of which represented cash skimmed from Crazy Eddie prior to 1976. This cash, he testified, was stored in a false ceiling in his home. In his January, 1994 deposition, however, Sam M. testified that by 1976, he had accumulated approximately $3.5 million *total* from Crazy Eddie and his other businesses. Ultimately, Sam M. conceded that he "never knew how much the real total amount of cash was." *Testimony of Sam M. Antar*, Vol. 11.166.

Moreover, by 1976 Crazy Eddie was operating only three stores. By contrast, by the end of 1979, there was a total of eight Crazy Eddie stores, including the stores in Paramus and East Brunswick, which had the highest sales figures of all Crazy Eddie stores. It is unlikely that Sam M. could have skimmed approximately $3.5 million from the Crazy Eddie stores by 1976. It is far more plausible that he skimmed the millions of dollars of cash from the eight to ten Crazy Eddie stores existing in the late 1970's and early 1980's.

Sam M.'s testimony that he had accumulated approximately $5 million by 1976 is also belied by the fact that he had to borrow money from the company. In an amendment to its Form S–1 Registration Statement filed with the SEC on September 12, 1984 in

---

**19.** For purposes of clarity, when quoting from Uncle Eddy's testimony, this court will utilize the somewhaṭ colloquial citation form *"Testimony of Uncle Eddy "*.

connection with an attempted IPO of Crazy Eddie common stock, the company noted that "[s]ince its inception, [Crazy Eddie] frequently made loans on an interest-free basis to Eddie Antar, Sam Antar and members of their family to meet family needs." *Plaintiff's Exhibit 6*, at 32. Taking interest-free loans from Crazy Eddie is clearly not consistent for a man who claims to have had approximately $5 million in cash stashed away in his ceiling.[20]

At the heart of Sam M.'s defense is that by 1976, he had stopped skimming altogether from Crazy Eddie. According to Sam M., he simply believed that it was time to stop the skimming. In that regard, he testified that in 1976 he proposed that Crazy Eddie implement a pension and profit sharing plan pursuant to which twenty-five percent of a qualified employee's income was contributed to the plan. Sam M. viewed the pension plan as a means of legitimizing the company's operations and bringing it into compliance with the tax laws. Sam M. further testified that by 1976, he had enough money to take care of his family for generations and thus, no longer needed to skim cash from Crazy Eddie. This is simply not believable.

First, Sam M.'s testimony that he proposed the implementation of the pension plan to end the cash skimming at Crazy Eddie does not ring true. If he wanted to end the skimming, he could have simply stopped skimming cash, without bothering with pension and profit sharing plans. Second, while the company's contributions to the pension plan were at times substantial—$2.4 million in 1982 and $2.3 million in 1983—these contributions were partially offset by forfeitures caused by employees leaving the company. Accordingly, in 1984 Crazy Eddie was not required to make any contribution to the plan "because required contributions were offset by employee forfeitures in the amount of approximately $2,000,000 which occurred

during the years 1980 through 1983." *Plaintiff's Exhibit 6*, at 48. This is not to say that the cash skimming and the pension contributions left the company in any great financial shape. Indeed, the company suffered a working capital deficiency for fiscal years 1980 through 1984, caused in some measure by the cash skimming. However, Sam M. testified that the working capital deficiency did not have a significant impact on the company's operations since the cash flow was more than enough to offset any such deficiency.

Third, with almost forty years of skimming cash from his businesses behind him, Sam M.'s testimony that he suddenly became concerned with Crazy Eddie's compliance with the tax laws strains this court's credulity.

Fourth, Sam M.'s testimony that he stopped skimming because he concluded in 1976 that he had accumulated enough money to take care of his family for generations strikes this court as particularly hollow. Apparently, he did not feel the same way about his other businesses since Sam M. admitted at trial that he continued to skim cash from his other far-flung businesses. Moreover, it is difficult for this court to believe that having skimmed money from his businesses for approximately forty years, Sam M. would have suddenly stopped skimming from a business which has been described as the "Golden Goose" of retail stores:

Q. Did you ever have any discussions or conversations with Sam M. concerning skimming with his other businesses like Sound Machine, like skimming from Crazy Eddie?

A. It was represented to me that the most money they made was from Crazy Eddie's, nothing could compare.

THE COURT: Who represented that to you?

---

**20.** It is also doubtful that the false ceiling in Sam M.'s Brooklyn home could have held $5 million in cash. Sam M. testified at his deposition that the false ceiling consisted principally of small area between two ·Celotex ceiling tiles and a plasterboard ceiling located above the Celotex. According to Sam M., the cash was stored directly on top of the two Celotex tiles. He admitted, however, that the vertical space between the tiles and the plasterboard ceiling was so small that he could not set the purported packets of cash on top of each other.

THE WITNESS: Sam M. Antar. Nothing compared in relation to the money they were making at Crazy Eddie's. Crazy Eddie's was the goose that laid the golden egg.

THE COURT: Is that your statement or somebody elses?

THE WITNESS: Used to call it the Golden Goose.

THE COURT: What?

THE WITNESS: Golden Goose.

THE COURT: The Golden Goose.

*Testimony of Sam E. Antar, Vol. 1.133.*

Fifth, Sam M.'s contention that he stopped skimming in 1976 is undermined by the testimony of Uncle Eddy. At trial, Uncle Eddy testified as follows:

THE COURT:—your relationship at the time with your brother, Sam M., when you were bringing money from the Crazy Eddie managers to his home, would I be fair in concluding that it was a friendly relationship?

THE WITNESS: Absolutely.

THE COURT: And you certainly knew, did you not, that the money that you were bringing was skimmed money, is that correct?

THE WITNESS: Yes, sir.

THE COURT: And based on what your brother said and did, is it fair to conclude or not fair to conclude, that he knew it was skimmed money when you brought it to his house.

THE WITNESS: Of course, he did.

THE COURT: What is the basis of the answer?

THE WITNESS: I gave it to him. He knew where I was getting it from. I didn't have any money of my own. I didn't have a store that produced that kind of money. My store did a couple hundred dollars a year in business, so I couldn't give him any money from anything I had. Why would I give him so much money at all?

I would give it to myself if it was mine.

THE COURT: So your answer is yes, he knew?

THE WITNESS: He must have known.

THE COURT: Did he discuss the fact that it was Crazy Eddie money with you?

THE WITNESS: We talked about it many times.

THE COURT: Many times.

All right. So the concept of skimming was a subject for discussion many times, is that a fair statement?

THE WITNESS: Yes, sir.

*Testimony of Uncle Eddy, Vol. 8.72–73.*

In addition, Uncle Eddy testified that in early 1984, he was instructed by Sam M. and Eddie to destroy the diaries he had saved showing Crazy Eddie's actual cash receipts and the amounts he had distributed to the members of the Antar family. Sam M. told Uncle Eddy that he wanted the diaries destroyed because the company was going public and he did not want to risk exposure of any evidence of cash skimming. Such conduct is not consistent for a person who asserts that his cash skimming days ended in 1976.

This court is therefore unpersuaded by defendants' contention that cash skimming did not occur at Crazy Eddie after 1976. Rather, the preponderance of the evidence leads this court to conclude otherwise.

(2) *The Gradual Reduction Of Cash Skimming Leading Up To 1984*

The defendants also contend that the SEC has failed to prove its "3–2–1" theory of cash skimming from 1979 to the time of the company's IPO in 1984, and that even if there were such a scheme, they neither participated in nor were aware of its existence. They argue that it is simply unbelievable that Eddie and Sam M., a full three to four years prior to the IPO, could envision taking the company public and then implement a highly disciplined scheme through which they, and members of their family, gradually reduced their cash skimming over the time period. In support, the defendants contend that the issue of taking Crazy Eddie public was not discussed until sometime in 1982 or 1983.

Contrary to the defendants' assertions, this court does not find Sam E.'s testimony on this point to be inherently preposterous. Sam E. did not testify, as the defendants seem to imply, that the goal of taking Crazy Eddie public was a formal plan or strategy. Rather, he testified as follows:

THE WITNESS: They wanted the company to grow and eventually become a public corporation. They didn't know it was going to become a public corporation in '79 or '80. It was only a goal, only a dream, but that is what they wanted to ultimately do.

*Testimony of Sam E. Antar,* Vol. 1.147–148. Indeed, not only did I find Sam E.'s testimony concerning the gradual diminishment of cash skimming leading up to the Crazy Eddie IPO to be credible, I found it to have been a coherent and lucid explanation of what occurred at Crazy Eddie between 1979 and 1984. It is clear to this court that Eddie and Sam M. in particular had the intellect and ambition to formulate such a goal, the discipline to work towards it, and the power over family members to align their interests.

Moreover, this court does not find preposterous, as argued by the defendants, that senior members of the Antar family freely discussed sensitive details of their business with Sam E., whom they claim had no stature either within the family or in the business. As noted previously, this was a close knit family where notions of trust ran very deep. Sam E., as Sam M.'s nephew and the cousin of Eddie, Mitchell, and Allen, was clearly a member of the inner circle. He grew up with Sam M.'s family, and felt as comfortable in their home as in his, which was nearby. He was also an extremely bright young person. It is clear that Sam M. took his nephew under his wing at a tender age. Sam M. gave Sam E. his first job when he was twelve years old. Sam M. and Eddie also provided Sam E. with financial support to attend college, and in 1979, Sam E. graduated from Baruch College with a bachelor's degree in business administration and public accounting. His closeness with Sam M.'s family is further evidenced by his meteoric rise at Crazy Eddie, from comptroller and head accountant in 1984, to Chief Financial Officer and Executive Vice President in August, 1986, and finally to a seat on the company's Board of Directors in December, 1986. It is therefore not surprising at all that Sam M., Eddie, and other members of their family would discuss sensitive matters in the presence of Sam E.

While the above discussion necessarily focused on the role and awareness of Sam M., this court also finds that both Kuszer and Allen were both, at the very least, aware of the "3–2–1" process of cash skimming at Crazy Eddie from 1979 through 1984. Admittedly, neither Kuszer nor Allen were as instrumental as Sam M. in developing and executing the scheme. There was, however, sufficient credible evidence presented by the SEC to establish by a preponderance of the evidence that Kuszer and Allen were aware of the scheme, and in some respects, participated in it.

The evidence showed that between Kuszer and Allen, the former was more involved in the fraudulent scheme than the latter. Evidence was presented, for instance, that Kuszer traveled to Israel in April, 1980 and deposited the sum of $600,000 in cash into account number 31332. Kuszer was accompanied by Mitchell and Solomon Antar, and the trip was paid for by Sam M. Again, in May, 1983, Sam M. paid for Kuszer's trip to Israel where he deposited $1 million in cash into the secret account. Indeed, in May, 1982, Sam M. added Kuszer, among others, as signatories to account 31332, which Sam M. would unlikely have done had Kuszer not been intimately involved with Sam M. in the cash skimming at Crazy Eddie.

In light of his conduct in connection with the secret accounts in Israel, Kuszer's testimony that he merely suspected that some of the money being deposited in Israel came from Crazy Eddie is not credible. Rather, the evidence shows that not only was Kuszer involved in the cash skimming process, but both he and Allen were fully aware of the of the "3–2–1" process and its intended effect. Sam E. specifically placed both Kuszer and Allen at meetings among family members,

primarily at Sam M.'s house, in which the "3–2–1" skimming process was discussed.

### (3) *Sales of Stock by the Defendants*

By the end of 1983, Sam M. and Eddie had taken substantial steps to launch an IPO of Crazy Eddie stock. They first attempted to take the company public with a "red herring" issued in May, 1984. Sam M., Eddie, Sam E., Mitchell, and representatives of the underwriting firm of Oppenheimer & Company went on a "road show" in June, 1984 to promote the IPO to prospective investors. Although the defendants have argued that Eddie and Sam M. were by this time locked in a bitter family feud, both participated in the "road shows". During these road shows, Sam M. told investors of the positive aspects of Crazy Eddie, including its growth during the previous five-year period. The May, 1984 public offering, however, was unsuccessful.

On September 13, 1984, Crazy Eddie did effect an IPO of its common stock. The company filed a registration statement on Form S–1 with the SEC. Among other things, the registration statement reported Crazy Eddie's income before pension contribution and income taxes for its fiscal years 1980 through 1984. Professor Robert J. Sack, an expert witness in the areas of public accounting and securities offerings of public corporations, testified on behalf of the SEC that as a result of year-to-year variations in tax expenses and significant changes in the pension plans during the years in question, that measure of income provided a more realistic method of evaluating how well the company was operating from year to year as well as comparing it with other retail electronics firms.

As a result of the cash skimming, however, Crazy Eddie's reported income figures were materially false and misleading. The cash skimming which occurred at Crazy Eddie between 1979 and 1984 artificially reduced the company's reported income on a dollar-for-dollar basis. Under general accounting practice, materiality is defined as an error or misstatement of five to ten percent or more. In each of Crazy Eddie's fiscal years 1980

through 1983, the cash skimming materially altered the reported income figures for those years.

Moreover, the skimming materially altered the trend of Crazy Eddie's reported income for those four years. The income trend is especially important to investors deciding to buy or sell securities of a company, since they consider earnings in both the current year and the prior years to extrapolate what they expect the company to earn in the reasonably foreseeable future. Indeed, two analysts' reports concerning Crazy Eddie, issued in January and May, 1985, utilized the false and misleading income figures reported for 1983 to predict the company's income for 1985 and 1986. Professor Sack testified that Crazy Eddie's "trend line in the reported net income, as it was in the prospectus, would be much more attractive than the trend line would have been had the cash skimming not taken place." *Testimony of Robert J. Sack,* Vol. 9.29. The actual trend line would have shown a stable business rather than one with a growth trend. An average investor would have been less likely to invest in the company had the cash skimming been reported.

Crazy Eddie's then-current liabilities as stated in the registration statement were also false and misleading because they did not account for the cumulative tax liability that had arisen as a result of the cash skimming.

Two million shares of Crazy Eddie stock were offered to the public in the IPO. Of these, the company sold 1.4 million shares, and Sam M. sold 300,000 shares. At $8.00 a share, Sam M. obtained gross proceeds of $2.4 million.

In March, 1985, Crazy Eddie conducted a secondary public offering. A "secondary" offering occurs when a company sells additional shares of stock to the public after its IPO. In furtherance of this secondary offering, Crazy Eddie filed with the SEC a registration statement on Form S–1 which contained the same materially false and misleading income and earnings growth data as the September, 1984 registration statement.

Of the 1.2 million shares of Crazy Eddie stock offered to the public, members of the

Antar family sold 1 million shares and the company sold 200,000 shares, at $21.00 a share. Specifically, Sam M. sold 150,000 shares for gross proceeds of $3,150,000. Allen and his wife sold 50,000 shares for $1,050,000. Kuszer and his wife sold 50,000 shares for $1,050,000.

On October 10, 1985, Sam M. sold 450,000 to Bear, Stearns & Company in a private transaction, for gross proceeds of $5.4 million.

Sam M. also sold 60,000 shares of Crazy Eddie stock on the open market on February 19 and 20, 1986. On February 20, 1986, Allen sold 20,500 shares and received gross proceeds of $451,000.

When the defendants made the above-mentioned sales of stock, they knew that cash skimming had occurred at Crazy Eddie between 1979 and 1984. They also knew that the skimmed cash was not included in the reported incomes for the five years prior to Crazy Eddie's IPO. Accordingly, when these trades were conducted, the defendants knew that the income figures for the time period between 1979 and 1984, and thus, the earnings growth trend, were false and misleading as a result of the cash skimming.

#### (4) *Sales of Stock on Behalf of the Relief Defendants*

In connection with the March, 1985 secondary offering, Eddie, in his capacity as custodian under the Uniform Gifts to Minors Act, sold 25,000 shares of Crazy Eddie stock on behalf of each Relief Defendant, for a total of 150,000 shares. As a result of Eddie's sale, the Relief Defendants received aggregate proceeds of $3,150,000. Eddie sold this stock as custodian with knowledge of the cash skimming fraud which occurred between 1979 and 1984 as well as the warehouse inventory fraud perpetrated immediately prior to the secondary offering, as described below.

In February or March, 1985, after the IPO had already taken place, Eddie engaged in conduct to fraudulently inflate the company's warehouse inventory by $2 million. The fraudulent inflation of inventory counts increased Crazy Eddie's reported pre-tax income on a dollar-for-dollar basis; that is, it went directly to the company's bottom line. Under generally accepted accounting principles, Crazy Eddie's gross profit on sales for any fiscal year was calculated as equal to net sales receipts for that year less the cost of goods sold. The cost of goods sold, in turn, was equal to the value of the company's inventory at the start of the year, plus the cost of new merchandise purchased during the year, less the value of the inventory at year-end. By artificially inflating the company's inventory at the end of the fiscal year, Eddie artificially decreased the company's cost of goods sold by an identical amount, and thus, artificially increased Crazy Eddie's earnings by that amount.

Shortly prior to the taking of inventory for the 1985 fiscal year-end, Eddie instructed David Neiderbach and Arnold Spindler, employees of Crazy Eddie, to inflate the warehouse inventory by $2 million. At trial, Neiderbach provided substantial evidence concerning this fraud. Moreover, in his allocution in connection with his guilty plea in the criminal matter, Eddie admitted that he caused the value of Crazy Eddie's inventory to be overstated by approximately $2 million, thus corroborating the testimony of Neiderbach.

For the 1985 fiscal year, Crazy Eddie filed with the SEC an annual report on Form 10-K. In that filing, Crazy Eddie reported that it earned pretax income of $12.6 million. This figure, however, was fraudulently inflated by $2 million, or almost twenty percent, as a result of the warehouse inventory inflations. When Eddie sold the stock on behalf of the Relief Defendants, he was fully aware of the fraudulent inventory inflation and its effect on Crazy Eddie's pretax income.

The Relief Defendants contend that they were not unjustly enriched from this sale of stock. They contend that although custodian of the stock, Eddie was not the ultimate decisionmaker. Rather, they contend that Kuszer and Allen made the decisions to sell the stock held on behalf of their children. Kuszer and Allen assert that they were not

aware of either the cash skimming between 1979 and 1984 or the $2 million inventory inflation. Thus, they conclude, the stock held on behalf of the Relief Defendants was not sold on the strength of material, non-public information.

As an initial matter, this court finds that the decision to sell the stock on behalf of the Relief Defendants was made by Eddie. I note that the contentions made by the Relief Defendants that the decisions were made by their respective fathers were based solely on the testimonies of Allen and Kuszer, both of which I find to be not credible. Indeed, Allen gave conflicting testimony on this issue, testifying at one point that Eddie made the decision to sell the stock:

> Q. Was the decision—the initial decision to sell the stock in December of 1986, as well as the decision in March of 1985 to have your children's stock sold as part of the secondary offering, was that initially your decision or Eddie's decision?
>
> A. No. That was, I think, Eddie's decision. I think, like you say, it was a secondary offering. I don't know really what it is, but they just sold the stock themselves. I didn't sell it.

*Testimony of Allen Antar*, Vol. 18.68–69.

With that said, the determination of whether the decision to sell the stock on behalf of the Relief Defendants was made by Eddie, Allen, and/or Kuszer is not entirely significant. The defendants and the Relief Defendants clearly pushed this point based on the assumption that this court would find that neither Kuszer nor Allen were aware of the cash skimming at Crazy Eddie between 1979 and 1984 or the $2 million inventory inflation immediately prior to the March, 1985 secondary offering. With respect to the second prong of this argument, this court does agree with the defendants and Relief Defendants that the SEC has failed to prove by a preponderance of the evidence that either Kuszer or Allen were aware of the

inventory inflation carried out by Eddie, Neiderbach, and Spindler in February or March, 1985.[21] However, as determined by this court previously in this opinion, both Kuszer and Allen, like Eddie, were fully aware of the "3–2–1" process of cash skimming between 1979 and 1984 leading up to the IPO and the first secondary public offering in March, 1985. Thus, even if Allen and Kuszer did direct Eddie to sell the stock on behalf of the Relief Defendants in March, 1985, the Relief Defendants would nevertheless be unjustly enriched since both Allen and Kuszer, at that time, possessed material, non-public information.

### D. *Fiscal Year 1986 Frauds*

The evidence presented by the SEC shows by a preponderance of the evidence that in January or February, 1986, Sam M., Eddie, Allen, Kuszer, Mitchell, and Sam E. met in Eddie's office and planned a series of other frauds to increase profits and maintain the appearance of growth at Crazy Eddie. I found Sam E.'s testimony on this point to be credible.

> Q. Mr. Antar, let me turn your attention to another topic now.
>
> Do you recall attending a meeting in the time frame of January or February of 1986?
>
> A. Yes, I do.
>
> Q. And who else attended that meeting that you first recall?
>
> A. Myself, of course, Sam M. Antar, Ben Kuszer, Allen Antar, Eddie Antar and Mitchell Antar.
>
> Q. Where did this meeting take place?
>
> A. In Eddie's office at Crazy Eddie at 2845 Coney Island Avenue, the offices of Crazy Eddie's.
>
> Q. And at this meeting who did most of the talking, if anybody?
>
> A. Mostly it was Eddie.

---

**21.** According to the evidence presented, the earliest the defendants could have been informed of the 1985 inventory inflation was in January or February, 1986 at a meeting among Eddie, Sam M., Allen, Mitchell, Kuszer, and Sam E. There was no evidence presented of an earlier meeting or discussion among the group concerning the inventory inflation.

Q. And what did the other participants in the meeting do?

A. They had participated in the discussion relating to the subject matter of the meeting and asked questions.

*Testimony of Sam E. Antar,* Vol. 2.58–59.

The purpose of the meeting was to discuss and develop various other schemes to augment the appearance of Crazy Eddie as a profitable and growing company. This was important because Sam M. and Eddie were contemplating another secondary public offering for March, 1986, in which they planned to sell $20 million worth of their private holdings of Crazy Eddie stock. At the meeting, Eddie expressed concern about two events that could adversely affect the March, 1986 offering: the comparable store sales results, which were scheduled to be publicly announced prior to the offering, and Crazy Eddie's earnings for fiscal year 1986.

A. [Eddie] was concerned about the comparable sales store report that would be issued prior to that public offering that was being planned, and also about the earnings for the fiscal year ending May 2nd, 1986. That report would be—that report would be issued after the public offering would be planned. He was concerned about both situations.

Q. And did Eddie say why he was concerned about earnings that would be released after the public offering?

A. He was considering with his father selling a significant amount of shares of stock of Crazy Eddie's pursuant to the planned public offering. It was over $20 million in stock, and they didn't want any earning surprises after the public offering that could involve litigation.

Q. And—

A. In other words, they didn't want to have a public offering, and then have something that Wall Street wasn't expecting on the earnings, negative earnings, negatively received earnings report.

Q. And these were things that Eddie himself said?

A. Not only Eddie, no.

Q. Who else said such things, and if you can specify what a particular person said, that would be fine.

A. Sam M. Antar also expressed concerns.

THE COURT: Where did he express these concerns?

THE WITNESS: Again, this meeting that I am testifying to now, your Honor, the entire meeting occurred in Eddie's office at Crazy Eddie's.

* * * * * *

THE COURT: Anybody else present other than Sam M. Antar and yourself?

THE WITNESS: Eddie Antar, Mitchell Antar, Allen Antar and Ben Kuszer. Nobody else was present.

*Testimony of Sam E. Antar,* Vol. 2.61–62.

Accordingly, based on the discussion held among select members of the Antar family in January or February of 1986, various schemes to artificially inflate profits and earnings were conceived and executed.

(1) *Comparable Store Sales*

In assessing the comparable store sales fraud, this court begins with Eddie's allocution, in which he admitted that he caused an infusion of approximately $2 million into bank accounts of Crazy Eddie comparable stores to inflate the reported sales in those stores. The money was transferred from Eddie's secret account in Bank Leumi in Israel through a branch located in Panama City, Panama. The transfer was effectuated in the name of a fictitious Panamanian corporation.

Comparable stores are retail stores that have been open for at least the prior twelve months which provide a basis for comparing how well a certain store is doing year to year. The sales increases of Crazy Eddie's comparable stores were of particular interest to the securities analysts who followed the company's stock. The purpose of infusing cash into the comparable stores was described by Sam E. at trial:

Q. Can you describe for the Court how depositing cash or drafts into the compara-

ble stores would also have an impact of increasing the sales and income of the company?

A. Because first, you're counting the money as if you got it from a customer, but in this case the customer is not getting anything in return, so it is like a pure profit to the company.

You are getting $2 million, between a half a million in cash and a million and a half in Panama, and you are giving back nothing in return, so it is a pure two million or a million 980 in income before taxes.

*Testimony of Sam E. Antar,* Vol. 2.96.

Both Eddie and Sam M. wanted the fourth quarter comparable store sales figures for fiscal year 1986 to increase at a sufficiently high level to enable them to obtain an advantageous price on the stock they planned to sell in the offering. Specifically, they wanted comparable stores sales for the quarter to reach 14%. At the time, comparable store sales figures were running at only 4% to 5%.

The evidence presented in this case shows that to increase the comparable store sales, Sam M. and Eddie proposed to inflate the figures to the target 14% by transferring $1.5 million from their secret bank accounts in Israel directly into the bank accounts of the comparable stores. On February 27, 1986, Eddie transferred $1.5 million from one of his accounts at Bank Leumi in Israel to an account maintained at Bank Leumi's branch in Panama City, Panama. The transfer was effectuated in the name of a Panamanian corporation called "Aeronautics Traders Corporation". The next day, Bank Leumi Panama issued ten bank drafts, totaling $1.5 mil-

lion to Crazy Eddie. Solomon Antar flew to Panama and picked up the drafts, which were ultimately deposited in the stores' bank accounts to reflect comparable store sales for the fourth quarter of the 1986 fiscal year. To preserve the fiction that the $1.5 million reflected retail sales by the comparable stores, Crazy Eddie paid sales tax on the money.

The evidence shows that Sam M. knew that the Panama drafts were deposited to inflate the comparable store sales figures. In addition to evidence showing that Sam M. participated in the meeting held in January or February, 1986 and discussed the scheme with Sam E. and others, other evidence revealed that Sam M. bought Solomon Antar's $1,503 round-trip plane ticket to Panama with an American Express card in the name of "Sam Antar, Moore Industries, Corp." Moore Industries was a corporation formed by Sam M. in the 1950's which was later used as the holding company for the Crazy Eddie store located in Paramus, New Jersey. The only persons who had an American Express card in the name of "Moore Industries" were Sam M., Eddie, and Mitchell. Indeed, even if Sam M. was not aware of Solomon Antar's trip to Panama when the airline ticket was purchased, he certainly learned about it a short time afterward when he received his American Express bill. The American Express billing statement was addressed and sent to him. Sam M. testified that he was in charge of monitoring expenses paid with the American Express/Moore Industries card.[22]

At a second meeting held in January or February, 1986, Sam M., Eddie, Allen, Mitchell, Kuszer, and Sam E. decided that in addition to the $1.5 million that was to be

---

**22.** There is also other circumstantial evidence of Sam M.'s awareness of the scheme. Approximately one month after the Panama drafts were retrieved and deposited into the comparable stores, Sam M. used the Aeronautics Traders Corporation—the same corporate shell used to transfer the $1.5 million from Israel to the United States—as a vehicle for making a substantial personal investment. The investment opportunity was available only to non-residents of the United States. Thus, on March 28, 1986, Sam M. transferred $250,000 from Israel to Panama to invest in the venture.

While not directly related to the use of $1.5 million to pump up comparable store sales, Sam M.'s use of the Panama branch of Bank Leumi as a conduit in transferring money from his secret account in Israel shows his awareness of the procedure by which money could be transferred from Israel without leaving a paper trail. Certainly, his awareness provides foundational support for the SEC's allegations that Sam M. was aware of the transfer of $1.5 million from Israel, through Panama, to increase the comparable store sales.

transferred from Israel to the comparable stores, an additional $500,000 would be infused into the comparable stores. According to the testimony of Sam E., which I found to be credible, Sam M. initially agreed to provide the $500,000. As it turned out, however, Sam M. provided only $250,000, with Kuszer coming up with the other half. The total $500,000 in cash was delivered by Kuszer to Sam E. and Allen. The deposits into the comparable stores' bank accounts were made by Allen.

Also at the second meeting, Sam M., Eddie, Allen, Kuszer, Sam E., and Mitchell agreed to generate an additional $200,000 for the comparable stores by making a wholesale sale to Gateway Marketing, Inc. A sale made to wholesale customers would not ordinarily be credited to any particular store since the sale was executed by the wholesale department situated in the company's main office. The $200,000 proceeds from the sale were deposited into the bank account for the Crazy Eddie store in the Bronx, New York, one of the comparable stores. Sam E.'s testimony on this point was revealing:

A. It was decided that—well, the first meeting I previously testified that about a million and a half dollars was contemplated to being put into the comp stores, the first meeting amongst the six people describing the meeting at Eddie's office.

I also previously testified there was another $500,000 discussed at the second meeting. With that 500,000, additional sale to Gateway was discussed to further increase the comp store sales of Crazy Eddie without doing a cash infusion.

Gateway was a wholesaler of merchandise and we would try to sell approximately $200,000 of merchandise to Gateway for the purpose of further inflating comp store sales to get in the target figure to report what we wanted to—prior to that meeting where Sam and Eddie would sell stock—

\* \* \* \* \* \*

Q. To the best of your recollection, Mr. Antar, who spoke about the proposed sale to Gateway at the second meeting?

A. Allen had done some of the talking because he was going to handle the sale to Gateway.

Eddie had done some of the talking about the sale to Gateway, and I had done some talking about the sale to Gateway.

Q. And do you recall what, if anything— do you recall what Eddie said about the sale of Gateway?

A. That we wanted additional—approximately $200,000, maybe even more was discussed to be sold to a wholesaler or wholesalers to be pumped into the comp store sales.

Q. And what do you recall Allen saying about the proposed sale to Gateway?

A. That he would take care of contacting Gateway and making the sale.

Q. What did you say about the sale of Gateway?

A. I said that—make sure he gets booked into one of the comp stores, you know, in sum and substance, of course.

\* \* \* \* \* \*

Q. Was the sale actually made by the Bronx store?

A. No, it was not. It was made out of the office.

Q. And to your understanding what was the purpose of the sale to Gateway?

A. To inflate the comp store sales of Crazy Eddie's, to sell the stock.

*Testimony of Sam E. Antar*, Vol. 2.99–102.

Accordingly, with the Panama drafts, the $500,000 cash deposit, and the sale to Gateway Marketing—and taking into account the sales tax paid on these revenues—approximately $2 million from outside sources was deposited into the comparable stores' bank accounts, and the money was booked as proceeds of comparable store sales. This made up the potential $2 million shortfall resulting from the previous year's inventory inflation.

Sam M. and Eddie achieved their targeted 14% increase in comparable store sales for the fourth quarter of fiscal year 1986, and they duly announced this inflated result in a press release on March 6, 1986. The actual

increase in comp store sales for that quarter was only 9.8%.

Crazy Eddie's reported 14% increase was materially false and misleading. Comparable store sales are important in assisting investors to project future sales and earnings, and they were relied upon by securities analysts who followed Crazy Eddie stock. Professor Sack testified that to an average investor or professional investment adviser, the actual 9.8% increase, if reported, would have suggested a company that is growing by adding stores as opposed to increasing sales in the existing stores. Such a condition, if known, would have had an adverse effect on the price of Crazy Eddie stock sold to the public.

Shortly after the press release was issued, Crazy Eddie conducted a secondary public offering in which Sam M. sold 200,000 shares of his personal holdings of the company's stock, and Eddie sold 600,000 shares. With a per-share price of $26.375, Sam M. made gross proceeds of $5,275,000.

### (2) *Inflation of Inventories*

Having sold a substantial portion of their holdings in Crazy Eddie stock, both Sam M. and Eddie could not afford any earnings surprises. To ensure that earnings for the quarter would be favorable, Sam M. and Eddie developed a plan to inflate Crazy Eddie's inventories at the meeting held in early 1986. Specifically, the scheme was intended to comprehensively inflate the inventories in the warehouse, the stores, and the returns department. The three-pronged scheme would be executed by three groups. First, Neiderbach and Spindler were to again inflate the warehouse inventories. Second, Mitchell, Allen, and Kuszer were to inflate the store inventories. And third, David Panoff, another employee of the company, was to inflate the returns inventory.

An inflation of Crazy Eddie's store inventories took place on March 2, 1986 in Sam E.'s office at Crazy Eddie's corporate headquarters in Brooklyn. Present to carry out this store inventory inflation scheme were Sam E., Allen, Kuszer, Mitchell, and Eddie Gindi, a nephew of Sam M. On Sam E.'s instructions, the store managers brought the count sheets that had been prepared in the physical inventory to corporate headquarters. The count sheets were then altered to falsify the merchandise quantities listed on them.

On March 2, 1986, Neiderbach and Spindler—as they had done the previous year—falsified the warehouse inventories by changing the quantity figures on inventory count sheets. Neiderbach testified at trial as follows:

Q. And what, if anything, did Eddie Antar say to you at that time about the upcoming inventory for Crazy Eddie?

A. He had asked if I would be able to do the same thing I did the year before.

Q. And what did you say to him?

A. Again, I said I would see if I could do it, and that it depended on what the circumstances were, when we were taking the inventory.

Q. And prior to the commencement of the inventory for the 1986 fiscal year, did you have any subsequent conversation with Eddie Antar about the subject matter?

A. I only recall one conversation actually.

Q. Did there come a time when you were given a target to shoot for in inflating the inventory for the 1986 fiscal year?

A. Yes. I believe that was at the conversation that we just spoke about.

Q. What did Mr. Antar say to you? What did Eddie Antar say to you?

A. The number that they were looking for was approximately 6 million at this time.

\* \* \* \* \* \*

THE COURT: Six million over and above what you would normally find?

THE WITNESS: Yes.

\* \* \* \* \* \*

Q. And was, in fact, that the end result—let me rephrase it.

As a result of the inventory that was conducted for fiscal year 1986, was the inventory overstated by approximately $6 million?

A. Yes, it was.

**516**

*Testimony of David Neiderbach,* Vol. 19.130–132.

Neiderbach testified, however, that he did not know whether Sam M., Allen, or Kuszer played any role in the warehouse inventory inflation scheme or even whether they knew of the scheme. There is no indication, however, that Neiderbach would know one way or another. Neiderbach was not a member of the Antar family. He was simply an employee used by Eddie and the other Antar family members to execute one particular aspect of the fraudulent schemes perpetrated at the company. He received his marching orders from Eddie, and there would have been no need on his part to discuss the matter with anyone else. Accordingly, the fact that Neiderbach was unable to testify as to the defendants' participation in this particular scheme is not dispositive of the issue. Far more probative of this issue is the testimony of Sam E. who, as discussed above, specifically placed Sam M., Allen, and Kuszer at the meeting held in January or February, 1986 in which the details of the frauds perpetrated that year were discussed. Therefore, while this court agrees that Sam M., Allen, and Kuszer did not personally participate in the inflation of the warehouse inventories, this court finds that they were fully aware of the nature and extent of this particular scheme.

Another aspect of inventory inflation involved "reeps," which were defective merchandise that was to be returned to the manufacturers for credit. David Panoff, upon the instructions of Eddie and Sam E., inflated the "reeps" inventory. At trial, Panoff described how he inflated the inventory cards for returns, as well as some "overflow" merchandise that was stored in the warehouse:

A. I followed—well, pursuant to the instructions that Sam E. gave me, I proceeded to change the counts on the inventory cards by increasing the numbers on the cards which hadn't been audited, and Sam E. told me how to follow around the certifiers of the inventory, to make a note of the cards that they were checking because they only could spot check the cards for counts.

So by keeping track of which numbers—every inventory card had a unique number, so by keeping track of which numbers of the cards they had checked, I could exclude those from any changes, from any cards which I did change, and I did do that. I changed the cards and the numbers—I mean the numbers on the cards.

\* \* \* \* \* \*

Q. Now, let me move to a different subject matter and that relates to the subject matter of overflow inventory. The period of time which I am referring to is the time again when the 1986 inventory was conducted and ask you to begin with, if you would, tell us what the term "overflow inventory" means. What is it?

A. Overflow inventory was either bulk merchandise, very large size merchandise, or merchandise which had been purchased in very large quantities, such that in both cases, keeping that merchandise in the regular warehouse for distribution didn't make sense. They didn't have enough space for that, so there was an auxiliary warehouse which was on Colliers Lane in East Brunswick, and that housed both the overflow inventory and a portion of the reeps inventory.

Q. Can you tell us whether or not you engaged—you had a conversation with Eddie Antar and Sam E. Antar concerning the inventory in this warehouse that you just described?

A. Yes.

Q. Can you tell us what was said in that conversation?

A. Well, I don't recall the specifics of the conversation, but the outcome was that I agreed to change the counts on the inventory and the overflowing warehouse.

Q. When you say you agreed to change the counts, does that mean you agreed to inflate the counts?

A. Yes.

Q. Make it larger than it really was?

A. Right. Increase the value of the inventory.

Q. Can you tell us whether or not there was a target that you were expected to reach in inflating the inventory?

A. I think that for the reeps department it was $3 million, and I think it was the same for the overflow.

*Testimony of David Panoff,* Vol. 20.57–59.

Panoff also perpetrated a $3 million cut-off scam by creating debit memos falsely reflecting that returns merchandise had been shipped back to the manufacturers when, in fact, it had been left to be "double-counted" in the physical inventory. Panoff testified that in 1986, he increased the returned inventory figures by approximately $7 million.

Panoff, like Neiderbach, testified that he did not know whether Sam M., Allen, or Kuszer were involved in or were aware of this scheme. But like Neiderbach, Panoff was not in a position to know. Sam E. was in a position to know, and he testified credibly that the defendants were certainly aware of this scheme as it was detailed in the meeting held in either January or February, 1986. Accordingly, this court finds that Sam M., Allen, and Kuszer were fully aware of the nature and extent of this particular scheme.

### (3) *The Wren Cut–Off Scam*

It was also decided among the participants to conduct an inventory cut-off scam with a Crazy Eddie vendor named Wren Distributors. In this scam, Wren delivered $2 million worth of merchandise in February, 1986, before the close of the 1986 fiscal year. As the defendants had arranged, however, Wren did not send any invoices for the merchandise until after the March 2, 1986 fiscal year-end.[23] Thus, the Wren merchandise was counted in the physical inventory taken on

March 2, 1986, and because Wren had delayed sending the invoices, the transaction was not recorded as a purchase on Crazy Eddie's books and records. Sam E. succinctly testified as to the methodology and purpose of this scheme:

A. Just to clarify, Wren sold Crazy Eddie merchandise. What happened was that Wren would ship Crazy Eddie approximately a million and a half to $2 million in merchandise. That merchandise would be counted as part of our year-end inventory, thereby inflating the profits of Crazy Eddie.

The reason that it would inflate the profits of Crazy Eddie would be that the money that we owed Wren pursuant to that shipment would not be reported until after the year ended into the next year, so therefore, for 1986, we would only show the inventory that came and resulted from the transaction with Wren, but not the liability that we owed Wren, not the money we owed them for the merchandise we received from them.

*Testimony of Sam E. Antar,* Vol. 2.129. This scheme, according to Sam E.'s testimony and Eddie's allocution, resulted in an artificial reduction of Crazy Eddie's accounts payable by $2 million.

### (4) *Crazy Eddie's 1986 Annual Report Filed with SEC*

In fiscal year 1986, the gross total of the defendants' inventory inflations, the artificial reduction in accounts payable, and cash infusions from outside sources was $16.5 to $20 million. After deducting $2 to $3 million for the 1985 fraud and $7 million for the excessive reserves that were taken, the net amount of the inflations was $7.5 to $10 million.[24]

---

**23.** When the shipments from Wren arrived, Neiderbach removed the packing lists from the Wren shipments and gave them directly to Eddie, rather than having them go through the regular procedure of being entered at the warehouse. Neiderbach was instructed by Eddie to do so to prevent the auditors from detecting the shipment from Wren.

**24.** This figure incorporates certain adjustments made during the course of committing the

schemes described above. Sam E. testified that during a meeting held in March or April 1986, Eddie decided to increase the target amounts of the inventory falsifications that were underway to ensure that the earnings and sales figures were on target. In attendance at this meeting were Eddie, Sam E., Mitchell, and Kuszer. Sam E. did not recall whether Sam M. or Allen were present. After the meeting, Sam E. continued inflating the store inventories with Eddie Gindi until they reached the increased target of $4 million. Sam E. also told Neiderbach and Pa-

Crazy Eddie filed with the SEC its annual report on Form 10–K for the 1986 fiscal year and reported a pretax income of $27.3 million. This income figure was materially false and misleading because, as a result of the falsifications described above, it was overstated by $7.5 to $10 million.

Sam M., Eddie, Allen, Kuszer, Sam E., and Mitchell held a meeting in June, 1986 where they reviewed what had been accomplished in the fraud. At this meeting, Sam M. voiced his concern about retaining documents which could incriminate them in the future. Accordingly, Sam E. saw to it that the falsified inventory count sheets and other incriminating documents were all destroyed.

### E. *Fiscal Year 1987 Frauds*

#### (1) *Zazy International*

Fiscal year 1987 presented Crazy Eddie with increased pressures to maintain the appearance that the company remained a strong, growing company. Having "built" the company on layers of fraud and deception, the Antars had long crossed the point of no return. From their perspective, the frauds had to continue not only to show increased profitability, but also to cover the previous years' frauds. In 1987, the Antars did not necessarily develop new schemes to artificially raise the price of its stock; rather, they merely applied slight variations to some old tricks. The frauds perpetrated at Crazy Eddie during fiscal year 1987 involved mainly a scheme with a company called Zazy International.

In May, 1986, Sam M., Eddie, Allen, Sam E., and Mitchell held a meeting where they discussed an inflation of Crazy Eddie's comparable store sales for the first quarter of the 1987 fiscal year. At that time, the company and its underwriters were preparing a public offering of convertible debentures. At the meeting, Eddie stated that he wanted to

make certain that the first quarter's comparable store sales figures achieved at least 10% growth over the previous year even though actual comparable store sales were running significantly below that level. According to Sam E.'s testimony, Eddie voiced his belief that hitting the 10% growth rate would enhance the benefits of the convertible bond offering. Allen suggested that to make up the shortfall, Crazy Eddie could sell merchandise to a transshipper named Zazy International and deposit multiple checks from the sale into the bank accounts of the comparable stores. Zazy International was peculiarly suited for this scheme because, as Sam E. testified at trial, it "could do a lot of volume . . . and we could take his checks and also deposit them into the comp stores whenever we needed to report the comp store results that we wanted to." *Testimony of Sam E. Antar,* Vol. 2.159–160.

The sale to Zazy International went ahead as planned. Crazy Eddie obtained $650,000 worth of checks from Zazy International and deposited them into the bank accounts of the comparable stores. The company then issued a press release reporting that comparable store sales in the first quarter of fiscal year 1987 increased by 10%, a figure which was false and misleading because it included the $650,000 worth of Zazy International checks. The actual comparable store sales growth for the quarter was 8.5%. Following the press release, the public offering of convertible debentures went forward as planned.

The scheme with Zazy International did not end with the convertible debentures offering, however. Crazy Eddie sold large quantities of merchandise to Zazy International after the first quarter of fiscal year 1987, and Allen, who was in charge of the wholesale department, was responsible for dealing with Sasson Cohen, Zazy International's owner. Indeed, Cohen went to Crazy Eddie's warehouse almost every day and

---

noff about the increased goals for the warehouse and returns inventories.

Crazy Eddie's inventories, however, were inflated more than was necessary. Consequently, Eddie and Sam E. reduced the total amount of

the 1986 fraud by asking the auditors to establish excessive reserves. Eddie and Sam E. told the auditors that they wanted to be very conservative in reporting the financial results and to save earnings for a rainy day. The dollar amount of the excessive reserves was $7 million.

placed orders with Allen. Pursuant to Allen's instructions, Cohen paid for the merchandise with multiple, undated checks in denominations ranging from $20,000 to $50,000. As Cohen testified in the criminal case, Allen "explained" to him that Crazy Eddie was

> a company that only sells to consumers and they can't show—from a public perspective they can't show they're selling wholesale. And if the checks are small, they could put it through the stores of Crazy Eddie afterwards. No one would know that they're selling wholesale.

*Plaintiff's Exhibit 184*, at 12.150.[25]

From June, 1986 through April, 1987, Cohen delivered $20 million worth of Zazy International checks to Allen. Under the arrangement they had, Cohen had to give Allen $1 million worth of checks before Zazy International could pick up merchandise from Crazy Eddie. Both Allen and Abraham Grinberg, the recently hired director of marketing for Crazy Eddie, received Zazy International checks from Cohen and delivered them to Sam E., who in turn, caused the Zazy International checks to be deposited into the bank accounts of the comparable stores. Before depositing them, Crazy Eddie accounting personnel back-dated the checks, usually to dates at the end of the fiscal quarters. As Eddie Gindi testified at a deposition conducted in connection with the criminal against Eddie, Mitchell, and Allen:

> Q. And I think you told us that ... Sam E. would give you checks from wholesale sales, correct?
>
> A. Correct.
>
> Q. Specifically from Zazy?
>
> A. Correct.
>
> Q. And that you can recall one instance where Allen gave you some checks, correct?
>
> A. Correct.

Q. And that wasn't—I mean, that wasn't out of the ordinary because you were a bookkeeper, right?

\* \* \* \* \* \*

A. It was—no.

I would—I would get the checks, but what was out of the ordinary was that they were all Zazy checks.

Q. ... Zazy was a wholesaler, correct?

A. Right.

Q. And that was one of Allen's wholesale accounts, correct?

A. Right.

But what was different than ... a regular wholesale sale was that there were a bunch of checks that weren't dated.

Q. Okay. And you took those checks then and gave them to who, Uncle Eddy?

A. No.

Q. Who?

A. I took those checks, dated them—or me or some other people dating them—and then giving them to the bookkeepers.

\* \* \* \* \* \*

Q. ... And then, you took those checks and did what with them after you dated them?

A. After I dated them, I separated into which stores—whatever stores that Sam E. wanted me to deposit them into.... So, you know, I got four checks for Syosset, three checks for Hartsdale, and then gave them to the bookkeepers to deposit them.

*Testimony of Eddie Gindi*, May 13, 1993 at 14–16. Allen told Cohen in advance when the checks were to be deposited.

As admitted by both Eddie and Mitchell in their allocutions, the comparable store sales were overstated as a result of millions of dollars worth of Zazy International checks being falsely entered as receipts from retail sales. Sam E. testified that for fiscal year 1987, approximately $10 million worth of Zazy International checks were deposited into the bank accounts of the comparable stores.[26] Of this amount, approximately

---

25. Sasson Cohen's testimony provided at the criminal trial of Eddie, Mitchell, and Allen was admitted into evidence by this court under Federal Rule of Evidence 804.

26. Although $10 million was infused into the comparable stores for fiscal year 1987, the comparable store sales increased by only $8 million. This is so, as Sam E. testified, because the $2 million inflation from the previous year had to be

$600,000 worth of checks alone were infused into the comparable stores during the first quarter of the 1987 fiscal year.

### (2) *Second Quarter: Sale of Stock*

In the second quarter of fiscal year 1987, the defendants inflated Crazy Eddie's comparable store sales with $3.2 million worth of Zazy International checks. The company issued a press release stating that the comparable store sales for the quarter increased by 15% over the prior year. In reality, the sales increased by only 6.8%. A few weeks after the press release, Sam M. sold 25,000 shares of Crazy Eddie stock at a price of $33.75 a share.

### (3) *Third Quarter*

In the third quarter, Sam E. made a troubling finding:

Q. And did you have occasion to calculate how the comparable store sales were running that quarter?

A. Yes.

Q. What was your conclusion?

A. That for the first time that I knew about we were having negative comparable store sales results. In other words, the comp store sales were actually declining. We have less comparable store sales in total than we had in the previous year, and that was the first time I could recall that happening.

*Testimony of Sam E. Antar,* Vol. 2.172. Sam E. feared that following public release of the adverse comparable store sales information, the past sales of Crazy Eddie stock by members of the Antar family would form the predicate for shareholder lawsuits alleging insider trading. He therefore discussed the negative comparable store sales with Sam M., Eddie, Allen, Kuszer, and Mitchell. Negative comparable store sales placed an enormous amount of pressure on what was already a delicate situation at Crazy Eddie:

A. What had happened was historically Crazy Eddie, since going public, and even the financial statements that were presented previous to going public from at least

included in determining the net gain of the com-

1979, historically Crazy Eddie had been reporting better results every year. For the first time in our history, as far back as I can recall at that time, Crazy Eddie was having a negative comp store sales quarter, a real negative comp sales quarter, and it just wasn't negative by an amount that I could rectify by having more sales sold to Zazy. It was an amount too big to be rectified, and as a result, the comp store sales would have to be reported with a negative sales result.

Q. And at the same time period were you also concerned about insider sales and stock?

\* \* \* \* \* \*

A. I was not only concerned about current insider sales—insider sales of stock at that time and into the future, but also previous insider sales of stock that had been made.

Remember when I testified yesterday that we had committed inventory fraud for the fiscal year ending March 2d, 1986. There was a comp store sales fraud for that same fiscal year.

However, before that public offering on March 7th, the comp store sales figures were released but not the profitability figures of Crazy Eddie. They were released two months later.

Again, I was worried about not only the current sales, but also—that it would be reported after the fact of the previous insider sales of stock.

*Testimony of Sam E. Antar,* Vol. 3.6–8.

Despite these concerns held by Sam E., Eddie proceeded to sell approximately $20 million worth of Crazy Eddie stock on November 6, 1986. Afterwards, Eddie began pressuring Sam E. to increase the comparable store sales to a profitable margin. Eddie wanted the sales to increase by 5% for the third quarter. Pursuant to these instructions, Sam E. launched a plan to "borrow" $5 to $6 million worth of checks from Zazy International for the purpose of inflating the

parable store sales.

comparable store sales. The scheme was cogently explained by Sam E. at trial:

A. ....We couldn't sell Zazy the merchandise because we couldn't take the merchandise and we needed 5 to $6 million worth of sales to be deposited into the comp stores. So what we did was, we had Zazy issue 5 to $6 million of checks in small denominations. I think the lowest denomination maybe $10,000, and maybe the highest was 25, 35, 40, maybe $50,000.

These $5 million worth of checks would be booked in the bookkeepers journals as if they received these checks for that quarter. However, the depositing of the specific checks would be held back until the—until we actually shipped Zazy the merchandise, so, in effect, we were borrowing his checks to book a sale, and when we later made the sale after the quarter, we actually deposited those checks.

So what would happen would be is when you did get—when you did the bank reconciliation, your books would show that you have a check from Zazy for $50,000, and the bank would show it doesn't have that $50,000. It would be considered a reconciling item, deposit in transit, so to speak.

*Testimony of Sam E. Antar,* Vol. 3.16–17. Sam E. further testified that although he developed the idea, he discussed the scheme with Sam M., Eddie, Kuszer, Allen, Mitchell, Abe Grinberg, and Sasson Cohen, the owner of Zazy International.

In executing this scheme, Cohen, the owner of Zazy International, gave the checks to Allen, and he and Abraham Grinberg delivered them to Sam E. Before the close of the third quarter, Sam E. booked the checks as deposits-in-transit credited to the comparable stores.

On December 4, 1986, Crazy Eddie issued a press release reporting that its comparable store sales for the third quarter of fiscal year 1987 increased by 5%. This figure was false and misleading because the comparable store sales had been inflated with $5.7 million worth of Zazy checks. In reality, the sales *decreased* by 8 percent. The defendants herein knew that the 5% increase in comparable store sales figure was false and misleading.[27]

Armed with this knowledge, on December 22 and 24, 1986, Allen sold 200,000 shares of Crazy Eddie for total gross proceeds of nearly $2.4 million.

### (4) *Fourth Quarter*

By the fourth quarter of the 1987 fiscal year, the cumulative effect of the frauds perpetrated at Crazy Eddie began to catch up with the Antar family. Sam E. informed the other members of the Antar family involved in the frauds at Crazy Eddie that the scheme concerning the comparable store sales had become untenable. There were several reasons for this. First, the cumulative effect of the previous year's comparable store sales—which had been inflated by a net amount of $2.1 million—required that comparable store sales for the fourth quarter of the 1987 fiscal year be inflated to astronomical numbers. That is, due to the previous year's

---

**27.** With respect specifically to Kuszer, Sam E. testified as follows:

Q. Did Ben Kuszer also know about the 5 or $6 million worth of Zazy checks, to your recollection?
A. Yes, he did.
Q. How do you know that he knew about it?
A. I had discussions with him.
Q. And where did those discussions take place?
A. At the offices of Crazy Eddie, Inc. and also at his apartment and also at Sam M. Antar's house.
Q. And were other people present for these conversations?

A. At his apartment I don't recall anybody being present. Maybe his wife could have been present. I don't recall particularly now, or his kids may have been present.
 At Sam M. Antar's house I recall Sam M. Antar being present at least during one conversation. At the offices I recall Mitchell present during one conversation. I know I had several private discussions about him. From time to time he would ask how things were doing and I would let him know how I was doing at the company.
Q. Approximately when did these conversations take place?
A. Regarding the 5 to $6 million increase, they took place during about November 1986.
*Testimony of Sam E. Antar,* Vol. 3.28–29.

inflation, Crazy Eddie had to beat the previous year's figure by an additional $2.1 million to compensate for the prior inflation. Second, Crazy Eddie's actual comparable store sales in the fourth quarter of fiscal year 1987 continued to decline. Third, the company could not inflate the sales with Zazy International checks because it already owed that company $5 to $6 million, which had to be "repaid" with the delivery of merchandise.

Because of these problems, the Antars did not make a substantial effort to inflate the comparable store sales in the fourth quarter. The sales were inflated with only $500,000 worth of Zazy International checks. Lacking other available means of pumping up the figures, Crazy Eddie reported a decrease in comparable store sales of 17% to 20% at the end of the fourth quarter.

### (5) The "Gap"

In connection with an upcoming audit for fiscal year 1987, Sam E. had occasion in November, 1986 to calculate the cumulative inflation at Crazy Eddie. Based on his calculations, Sam E. determined that from fiscal year 1985 to fiscal year 1987, the total amount of fraudulent inflations perpetrated at Crazy Eddie was $14.5 to $18 million. This was referred to as the "gap." Put another way, the "gap" was the difference between the true status of Crazy Eddie's financial situation and the fiction that was created due to the cumulative effect of the frauds. If no additional frauds were committed by the close of the 1987 fiscal year.

Crazy Eddie would have had to absorb a $14.5 to $18 million reduction in pretax income. In November, 1986, Sam E. spoke about the "gap" with Sam M., Eddie, Allen, Kuszer, Mitchell, and others.

To deal with the "gap" in Crazy Eddie's financial condition, Sam E. made a three-part proposal to Sam M. and Eddie. The first part of the plan was to have Sam M. and Eddie secretly transfer a total of $5 million cash into Crazy Eddie. The second part of the scheme was to generate an additional $5 million through fraudulent debit memos.[28] And third, Crazy Eddie would absorb a $5 million loss in earnings.

Throughout November, 1986, Sam E. had discussions with Sam M. and Eddie about putting up the $5 million, but neither ultimately put up any money. When it became clear that neither Sam M. nor Eddie was going to contribute his share of the $5 million, Sam E. increased the target amount of the debit memo fraud to $10 million. Sam E. later decided to create even more phony debit memos after his computations indicated that the gap had grown to $20 million. With respect to the phony debit memo scheme, Sam E.'s testimony was refreshingly to the point:

Q. And was there any basis and legitimate business practice for these debit memos?

A. For the phony debit memos, no. Taking a slight truth—you are taking a slight truth and building a falsehood on a slight

**28.** A debit memo is a document used by a retailer to charge an amount back to a vendor, and it reduces both the account payable owed to that vendor and, for purposes of determining the cost of goods sold, the amount of purchases for that fiscal year. The debit memo scam was described by Sam E. as follows:

A. The company will purchase merchandise from a vendor like television sets and we will get billed for it. So if I purchase 500 T.V.s I will get billed, say, $500,000 for T.V.s, and I will have an invoice of $500,000 that I have to receive from the vendor and post on the books as owing that vendor $500,000 until I pay for it.

A debit memo reverses out part of the money that I will owe the vendor. In other words, maybe some of those T.V.s came in broken,

and we should get a credit against that $500,000 that we owe the vendor, so a $10,000 debit memo may get issued.

Maybe they overcharged us on merchandise and should have billed us for $490,000, and a 10,000 debit memo might get issued. That is some of the examples of what it is. It is a reduction of what you owe somebody.

*Testimony of Sam E. Antar*, Vol. 3.58–59. This description was corroborated by Professor Sack in his testimony at trial.

The debit memos that were contemplated for the Crazy Eddie fraud in November, 1986 correlated to nonexistent discounts, such as fictitious rebate programs and fictitious co-op advertising programs. Many of the debit memos admitted into evidence showed debit charges for "Volume Incentive" or "Volume Program".

truth; the slight truth being that we were very aggressive dealing with our vendors and trying to get the best pricing we can on merchandise; the falsehood being this was not being aggressive. This was just making things up.

*Testimony of Sam E. Antar,* Vol. 3.62.

The total amount of the debit memo fraud was $20 million, which artificially increased Crazy Eddie's pretax income on a dollar-for-dollar basis. This conclusion is supported not only by the testimony of Sam E. and the actual debit memos admitted into evidence, but also by the statements made by both Eddie and Mitchell at their respective allocutions. Eddie admitted that "Crazy Eddie's accounts payable as of year end 1987 were significantly understated as a result of the creation of false documents, including false Crazy Eddie debit memos. . . ." *Allocution of Eddie Antar,* May 8, 1996 at 27. For his part, Mitchell likewise admitted that he and others executed the $20 million phony debit memo fraud at Crazy Eddie's 1987 fiscal year-end. *Allocution of Mitchell Antar,* October 10, 1996 at 19. The effect of the debit memo scam was to reduce accounts payable from $70 million to $50 million and to inflate the pretax income for the 1987 fiscal year by $20 million.

Another scheme developed to address the "gap" was an inventory cut-off scam with respect to merchandise delivered by Wren Distributors and Zazy International. This scheme was conceived by Sam E., Eddie, and Mitchell, and worked as follows. At Crazy Eddie's request, in February, 1987, Wren shipped $5 to $6 million worth of merchandise. Crazy Eddie counted the merchandise in its year-end physical inventory on March 1, 1987. Wren did not send any invoices for the merchandise until after March 1. As had been done previously, the invoices were counted into the following year's purchases, resulting in an inflation of earnings for fiscal year 1987 of $5 to $6 million.

Sasson Cohen testified at the criminal trial of Eddie, Mitchell, and Allen that in February, 1987, he was instructed by Allen and Grinberg "[t]o bring as much merchandise as

I could until the end of the month." *Plaintiff's Exhibit 184,* at 12.167. Pursuant to this scheme—referred to as a "borrowing arrangement"—Zazy International delivered $2.5 million worth of merchandise which was counted in Crazy Eddie's year-end physical inventory. The invoices for this merchandise, however, were not sent. After the fiscal year, Zazy International picked up $2.5 million worth of merchandise, including some of the same merchandise originally sent to Crazy Eddie and other "like kind" merchandise.

The existence and extent of this borrowing arrangement was corroborated by the testimonies of Sam E. at this trial and Sasson Cohen, who provided testimony under a grant of immunity at the criminal trial of Eddie, Mitchell, and Allen. Their testimonies are corroborated in part by the admissions made by Mitchell at his allocution. This evidence reveals not only the existence and extent of the borrowing arrangement, but that Allen, with the aid of Grinberg, was instrumental in implementing this scheme.

Allen, for his part, does not deny that he had a business relationship with Zazy International. However, he denies that he was ever aware that the transactions with Zazy International were fraudulent in any way. In essence, Allen attempts to portray himself as nothing more than a dupe, unaware of anything and just going about his business without any clue as to what was happening all around him. His defense amounts to nothing more than the good soldier defense: he was just following orders and he never asked about nor was he ever interested in the significance of the activities which he was ordered to carry out. This is simply not credible. Allen was in charge of the wholesale operations, and in that position, he was more than a mere dupe lacking any awareness of the extensive frauds perpetrated at Crazy Eddie. With respect specifically to the Zazy International borrowing scheme, Allen, along with Grinberg, was responsible for making the pricing arrangements on the buy and send-back of merchandise, determining how Zazy International would price the merchandise delivered to Crazy Eddie and

how Crazy Eddie would price merchandise going back to Zazy. Allen clearly understood that the borrowing arrangement, which he handled on behalf of Crazy Eddie, was part of a fraudulent scheme to increase the company's inventory without a corresponding increase in its accounts payable. Allen's blanket denials are simply unworthy of belief.

In total, the Wren cut-off scam and the Zazy International borrowing arrangement artificially reduced Crazy Eddie's accounts payable by $7.5 to $8.5 million.

As the scams concerning Wren and Zazy International were being perpetrated, Sam E., Eddie, and Mitchell were also inflating the returns and store inventories. The store inventory inflations began shortly after the March 1 physical inventory. For example, on the afternoon of Saturday, March 7, 1987, Sam E., Mitchell, Grinberg, and Eddie Gindi met to falsify the store inventories. According to the testimony of Sam E., Allen was aware of the falsifications

> [b]ecause he would leave the office a lot with Abe Grinberg and Mitchell Antar, and sometimes Abe Grinberg and Mitchell Antar would help or would supervise the inflation of the store inventories to make sure that the inflations were going along according to plan, and he would sometimes witness it.

*Testimony of Sam E. Antar,* Vol. 3.86. The store inventories were inflated by $15 to $20 million.

Sam E. also approached Panoff and eventually convinced him to inflate the returns inventories. Panoff enlisted the aid of Eddie Gindi, Spindler, and Grinberg, and in one particular instance, Mitchell. In total, Panoff enhanced the returns inventories by $6 to $7 million.

### (6) *Total Dollar Amount of Frauds for Fiscal Year 1987*

The extensive frauds perpetrated in the 1987 fiscal year had the net effect of inflating Crazy Eddie's pretax income by $40.5 to $43 million. In its 1987 annual report on Form 10–K, the company reported income of $21.1 million. In reality, the company suffered a $20 million loss. The reported income was materially false and misleading. The effect of this materially false and misleading information on the investing public was explained by Professor Sack at trial:

> Q. And to your knowledge, sir, were these figures followed by any analysts who tracked Crazy Eddie's performance?
>
> A. Yes, sir.
>
> Q. And what effect, in your opinion, did the income overstatement have on their conclusions?
>
> A. Again, they used the reported amounts to build projections for the following years and to . . . say that the company looked like it was increasingly profitable and, therefore, a worthwhile investment.
>
> Q. Now, in these two years did the company show that it was increasingly profitable?
>
> A. 1986 is more profitable than 1985 was. 1986 is more profitable than '85 and '84 and '83.
>
> 1987, of course, is not, but it still is a substantial profit especially when prepared to the loss which otherwise would have been shown.

*Testimony of Robert J. Sack,* Vol. 9.42. In sum, securities analysts who followed Crazy Eddie stock used the 1987 reported income to build projections for the following years and, based on the fraudulent figures, concluded that Crazy Eddie looked like it was increasingly profitable and therefore a worthwhile investment. The average investor would certainly have been less inclined to invest in Crazy Eddie if the $20 million loss had been reported.

The evidence also shows that Sam E. kept Sam M., Allen, and Kuszer informed as to various aspects of the frauds perpetrated in 1987. In particular, Sam E.'s testimony concerning Sam M.'s awareness of the frauds perpetrated in 1987 was clear and unwavering:

> THE COURT: How about conversations with Sam M. Antar? What was his mindset in '87? Was he around?
>
> THE WITNESS: Yes, he was around.

THE COURT: Did you speak to him?

THE WITNESS: Yes.

THE COURT: And—

THE WITNESS: I told him what was going on.

\* \* \* \* \* \*

THE COURT: How often?

THE WITNESS: Once or twice a week, or three times a week, to let him know what was going on.

THE COURT: Where would you see Mr. Sam M. Antar?

THE WITNESS: Either at the office of Crazy Eddie, Inc., either at his home. Sometimes I would drive him in my car.

THE COURT: Did you tell him about these various frauds, or did he acknowledge he knew about them?

THE WITNESS: I always let him know. There will be times that I will testify to later, that certain things I kept from him.

THE COURT: You told him about the accounts payable?

THE WITNESS: Yes.

THE COURT: Are you saying he knew about it?

THE WITNESS: He knew about it because I told him about it.

THE COURT: You told him about it?

THE WITNESS: Yes.

THE COURT: The Wren deal?

THE WITNESS: Yes.

THE COURT: The Zazy deal?

THE WITNESS: Yes.

THE COURT: Store inventory?

THE WITNESS: Yes.

THE COURT: And the reeps cut-off deal?

THE WITNESS: Yes.

THE COURT: All of those deals he knew about because you told him about it?

THE WITNESS: From time to time I would keep him informed as to the nature of the fraud and inform him as to various specifics as to what was going on.

*Testimony of Sam E. Antar,* Vol. 3.94–96.

Between July 2 through July 9, 1987, Sam M. sold 150,000 shares of Crazy Eddie stock for gross proceeds of $903,125. When he did so, Sam M. knew of the fraudulent activities which had been perpetrated at Crazy Eddie during the 1987 fiscal year and prior thereto.

## F. *The Unraveling*

The end of Crazy Eddie was not as much a sudden, traumatic event than a slow, lingering death. Over a period of time, with the mounting pressures of the cumulative effect of the frauds perpetrated at the company along with the ever-present family tension, Crazy Eddie simply unraveled.

By all accounts, the old family tensions began to resurface sometime in late 1986. Sam E.'s testimony on this point, which is not contested by any of the parties, is revealing:

Q. Mr. Antar in December of 1986, did you perceive that there were problems within the Antar family itself?

A. Yes. Problems were starting to surface again.

Q. And can you describe what those problems were?

A. There started to be increasing tensions between Eddie and his brothers and Eddie and his father.

\* \* \* \* \* \*

Q. Did Eddie tell you why he was drifting apart from his father and his brothers?

A. He felt his father was jealous of his success because his father was considered like the patriarch of the family, and he also felt that his father was dividing him with his brothers; that his father wanted him to take care of his brothers with the stock.

Eddie felt as long as he took care of his own daughters, that was his obligation. Eddie had stock when the company went public and gifted some to his daughters, and Eddie told me that his father wanted him to give stock to Mitchell and Allen.

Eddie told me that he told his father that is his business to give the stock to Mitchell and Allen. He took care of his kids. "Dad, you take care of your kids," to paraphrase what Eddie told me.

Q. Did you perceive Eddie was having problems with his first wife?

A. Yes.

Q. And did he tell you what those problems were?

A. I am not sure if that specific time he told me he was having problems with his first wife. I know he had previous problems with his first wife. I know that the family was upset about his life style, vis-a-vis his first wife, but I don't know if he was having a specific problem.

I know they didn't like the fact she was separated from him, but I don't know at that specific time if he was having any dispute with her.

*Testimony of Sam E. Antar, Vol. 3.50–51.* Based on these tensions, Eddie began to physically withdraw from the affairs of Crazy Eddie. In December, 1986, he resigned as president of the company, and in the following month, he resigned as chief executive officer.

This is not to say that Eddie abdicated all influence and control at the company. Eddie remained on as Chairman of the Board of Directors, and in December, 1986, he ordered the creation of an Office of the President through which he could continue to manage the company despite his physical absence. The Office of the President was comprised of Sam E., Mitchell, and Isaac Kairey. While not completely withdrawing from the compa-

ny, Eddie's resignations from two key positions at the company created a new source of tension. This fact was revealed in Sam E.'s testimony concerning Mitchell's ambivalence towards ascending to the position of the president after Eddie's resignations:

A. Mitchell initially did not want to be the president of the company. He did not like the fact that Eddie was leaving and leaving us with all of the work to clean up, and that Eddie was like taking a walk and taking a hike and leaving us with the fraud and everything else to handle, and Mitchell was upset about it.

*Testimony of Sam E. Antar, Vol. 3.54.*

As has been recounted above, Crazy Eddie was also experiencing mounting financial difficulties by late 1986. These difficulties attracted the attention of shareholders, and by January, 1987, the first of a series of shareholder suits was commenced.

In March, 1987, Sam M. resigned from the board of directors, frustrated at how the company was being run and his strained relations with Eddie. Sam M., however, continued to hold the position of Executive Vice-President, with an annual salary of $200,000.

In April, 1987, however, the situation at Crazy Eddie became far more untenable. The impetus for the turmoil was the initiation of a lawsuit by Eddie's first wife contesting the terms of their previous divorce agreement. The tensions within the family over Eddie's relationship with his first wife, which had long been simmering, now came to a full boil. Eddie fired Allen, who had originally sided with Eddie's first wife. Sam M. was also fired.[29] Moreover, Eddie ousted his ex-

---

**29.** Both Sam M. and Allen make much of the fact that they were fired by Eddie in April, 1987. They argue that such conduct on the part of Eddie would have been "patently implausible" if, as the SEC alleges, Allen and Sam M. possessed damaging information regarding the fraudulent schemes perpetrated at Crazy Eddie. This court is unconvinced by this assertion. First, other individuals who admittedly were involved in the frauds were also terminated. Arnold Spindler, who participated in the warehouse inventory inflations with Neiderbach, was also terminated. Arthur Grinberg, who along with Allen, participated in the scheme involving Zazy Internation-

al, was also terminated. Indeed, Mitchell, who pled guilty to charges involving many if not all of the fraudulent schemes at Crazy Eddie, was also forced out by Eddie for his support of Eddie's first wife.

Moreover, it was not "patently implausible" that Eddie would fire Allen and Sam M. even if they possessed damaging information. Indeed, there was little risk, from Eddie's perspective, that Allen, Sam M., and the others he terminated, would divulge any information since by doing so, they would necessarily implicate themselves in many of the frauds.

wife's mother from the company and went so far as to attempt to have her indicted for theft.

In May, 1987, Crazy Eddie received an unsolicited offer from the Belzberg family to purchase all outstanding shares of the company. Later that same month, a competing offer, again unsolicited, was made by Elias Zinn, a Texas retailer, to purchase all of the outstanding shares. Neither was successful, and the offers were ultimately withdrawn. In September, 1987, however, Zinn, this time in partnership with a New York businessman named Victor Palmieri, instituted a proxy fight for control of Crazy Eddie.

On November 6, 1987, Crazy Eddie's shareholders voted to remove the company's existing management backed by Eddie. A new management installed by Zinn and Palmieri took control of the company.[30] Soon thereafter, it discovered a $40 million inventory shortfall. This estimate was subsequently increased to $60 million. Zinn and Palmieri ultimately disclosed this inventory shortfall to the public.

Public disclosure of the inventory shortfall accelerated the civil litigation already pending against the company. The disclosure also coincided with an investigation by the SEC, which culminated in the present action against the defendants. The United States Attorney's office also launched a criminal investigation into the company's business affairs, which, as described above, ultimately resulted in the guilty pleas of Eddie and Mitchell.

## IV. CONCLUSIONS OF LAW

In its complaint, the SEC has alleged that the defendants engaged in insider trading in violation of § 17(a) of the Securities Act, § 10(b) of the Exchange Act, and Rule 10b–5.

Section 17(a) of the Securities Act provides as follows:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). As a general matter, § 17(a), and indeed the Securities Act as a whole, "was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud

---

**30.** At the time the new management team took control of the company, Sam M. held approximately 376,000 shares of Crazy Eddie stock. He argues that this demonstrates his unawareness of the frauds at the company. It is simply implausible, he argues, that a person with knowledge of the fraudulent schemes would hold onto his stock despite the fact that discovery of the frauds by the new management team would send the value of that stock plummeting. I do not find it as implausible as Sam M. contends. First, Sam E., who has admitted his knowledge of and participation in the frauds at the company, also held onto his stock until he was compelled to sell it in a margin call in October, 1987. At the time of his termination from the company, Sam E. also held 35,000 stock options, which he could have exercised and sold at a profit in the summary of 1987.

Second, and more importantly, holding onto this stock provided Sam M., from his perspective, with something far more valuable than the money he could have received from selling the stock: evidence tending to demonstrate his innocence in the frauds which occurred at Crazy Eddie. While there is evidence to show that Sam M. did confer with the company's attorney about selling his shares, holding onto the shares was a far more prudent move in light of the inevitable discovery of the fraudulent activities perpetrated at Crazy Eddie. Indeed, he had already made approximately $18 million from his prior stock sales. By selling all of his shares, he would certainly have made some money, but it would also have indicated a consciousness of guilt on his part.

and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Section 17(a) has been broadly construed to encompass a wide range of conduct. *See, e.g., SEC v. Benson,* 657 F.Supp. 1122, 1130 (S.D.N.Y.1987) (holding that omissions and misstatements about a corporation's income in securities registration statements violated § 17(a)).

■ Section 10(b) of the Exchange Act provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Stated simply, this provision proscribes (1) the use of any deceptive device (2) in connection with the purchase or sale of securities, in contravention of the rules prescribed by the SEC. The specific purpose of § 10(b) was "to protect investors against manipulation of stock prices." *Basic Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *see also In re Phillips Petroleum Securities Litig.,* 881 F.2d 1236, 1243 (3d Cir.1989).

Pursuant to the rulemaking authority provided by § 10(b), the SEC adopted Rule 10(b), which provides as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a mate-

rial fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ As noted by one court, § 10(b) and Rule 10b–5 have "always been acknowledged as catchalls" to prevent manipulation and misrepresentation. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 859 (2d Cir.1968) (en banc). The Supreme Court has recently reaffirmed that under what has been termed as the "traditional" or "classical" theory of insider trading liability,

§ 10(b) and Rule 10b–5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information. Trading on such information qualifies as a "deceptive device" under § 10(b), we have affirmed, because "a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with the corporation."

*United States v. O'Hagan,* 521 U.S. 642, ——, 117 S.Ct. 2199, 2207, 138 L.Ed.2d 724 (1997) (quoting *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)); *see also SEC v. Cherif,* 933 F.2d 403, 408–09 (7th Cir.1991). Section 10(b) and Rule 10b–5 liability may also flow from "misstatements and omissions in press releases, news articles, and quarterly and annual public filings." *In re Ames Dep't Stores, Inc. Stock Litig.,* 991 F.2d 953, 962 (2d Cir.1993). As recognized by the Third Circuit Court of Appeals, "Rule 10b–5 claims typically involve alleged misrepresentations with respect to the merits of a particular security." *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 942 (3d Cir.1985). Liability under § 10(b) and Rule 10b–5 is predicated on a showing of some " 'causal connection between the alleged fraud and the purchase

or sale'" of a security. *Id.* at 943 (quoting *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 194 (3d Cir.1976)).

■ In short, the provisions discussed above prohibit a person from selling securities while in possession of material, nonpublic information. *See O'Hagan,* 521 U.S. at ——, 117 S.Ct. at 2207 (1997); *Angelastro,* 764 F.2d at 942; *Texas Gulf Sulphur,* 401 F.2d at 848. The information that the seller possesses while trading must be material. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 167 (2d Cir.1980). Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. *See Levinson,* 485 U.S. at 231, 108 S.Ct. 978 (relying on *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Companies,* 75 F.3d 801, 810 (2d Cir.1996) ("[M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.").

■ The SEC must prove that the defendant acted with scienter. *Aaron v. SEC,* 446 U.S. 680, 691, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). To prove scienter, it must be shown that the defendants lacked "'a genuine belief that the information disclosed was accurate and complete in all material respects.'" *Phillips Petroleum,* 881 F.2d at 1244 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1198 (3d Cir.1979)). The term "scienter" includes both knowing and reckless [31] misconduct. *Hochfelder,* 425 U.S. at 193-94 n. 12, 96 S.Ct. 1375 (noting that scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud"); *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996) ("Scienter, as used in connection with the securities fraud statutes, means ... at least knowing misconduct."), *cert. denied,* —— U.S. ——, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *Phillips Petroleum,* 881 F.2d at 1244 ("[R]ecklessness on the part of a defendant meets the scienter requirement of Section 10(b) and Rule 10b-5.").

A. *The Defendants' Sale of Crazy Eddie Stock*

(1) Between September, 1984 and February, 1986, the defendants made the following sales of Crazy Eddie stock:

| Sam M. | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| Sept., 1984(IPO) | 300,000 | $ 8.00 | $2.4 million |
| March, 1985 | 150,000 | $21.00 | $3.15 million |
| Oct., 1985 [32] | 450,000 | $12.00 | $5.4 million |
| Feb., 1986 | 60,000 | $26.00 | $1.56 million |
| TOTALS | 960,000 | — | $12.51 million |

| Allen | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| March, 1985 | 50,000 | $21.00 | $1.05 million |
| Feb., 1986 | 20,500 | $22.00 | $451,000 |
| TOTALS | 70,500 | — | $1,501,000 |

| Kuszer | Number of Shares | Price/Share | Gross Proceeds |
|---|---|---|---|
| March, 1985 | 50,000 | $21.00 | $1.05 million |

**31.** Recklessness, in this context, has been defined as

"an extreme departure from the standards of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the actor must be aware of it."

*Phillips Petroleum,* 881 F.2d at 1244 (quoting *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977)).

**32.** The October, 1985 sale was a private transaction in which Sam M. sold the 450,000 shares to Bear, Stearns & Company.

■ When they made the above-described sales of Crazy Eddie stock, the defendants knew that: (a) Sam M., Eddie, and other members of the company's senior management had engaged in a cash-skimming scheme dating back to the company's predecessors in the early 1970's; (b) the skimmed cash was not included in the reported income for the five years prior to the IPO; and (c) the prior five-year income figures and, consequently, the earnings growth trend for that five-year time period were false and misleading as a result of the cash skimming.

This information was material in that it is substantially likely that a reasonable investor would have considered these facts important in making an investment decision.

■ (2) In a March, 1986 secondary public offering, Sam M. sold 200,000 shares of Crazy Eddie stock at $26.375 per share, for gross proceeds of $5,275,000. When he sold the stock, Sam M. knew of the pervasive level of fraudulent activity at Crazy Eddie. Specifically, and in addition to the facts discussed in subsection (1) above, Sam M. knew that: (a) Crazy Eddie's stated pretax income was overstated by $2 million as a result of the 1985 warehouse inventory inflations; and (b) Crazy Eddie had publicly announced comparable store sales for the fourth quarter of the 1986 fiscal year that were inflated by $2.1 million.

This information was material in that it is substantially likely that a reasonable investor would have considered these facts important in making an investment decision.

■ (3) On September 30, 1986, Sam M. sold 25,000 shares of Crazy Eddie stock at a price of $33.75 per share, for gross proceeds of $843,750. When he did so, Sam M. knew the true state of facts as described in subsections (1) and (2) above. In addition, Sam M. knew that the company's inventories had been inflated and its accounts payable artificially reduced in the 1986 fiscal year and that its comparable store sales in the first and second quarters of fiscal year 1987 had been inflated through the deposit of Zazy International checks.

This information was material in that it is substantially likely that a reasonable investor would have considered these facts important in making an investment decision.

■ (4) In December, 1986, Allen sold 200,000 shares of Crazy Eddie stock for gross proceeds of nearly $2.4 million. When he did so, Allen knew the true state of facts as they existed at Crazy Eddie as described in subsections (1), (2), and (3) above. In addition, Allen knew that Crazy Eddie's comparable store sales in the third quarter of fiscal year 1987 had been inflated through the deposit of Zazy International checks and that company employees had begun implementing a fraud for the close of the fiscal year by preparing phony debit memos.

This information was material in that it is substantially likely that a reasonable investor would have considered these facts important in making an investment decision.

■ (5) In the one-week period from July 2 through July 9, 1987, Sam M. sold 150,000 shares of Crazy Eddie stock for gross proceeds of $903,125. When he did so, Sam M. knew of the fraudulent activities which had been perpetrated at Crazy Eddie as described in subsections (1), (2), (3), and (4) above. In addition, Sam M. knew that Crazy Eddie's inventories had been inflated and its accounts payable artificially reduced in a massive and systematic fraud, the existence and extent of which he was informed during the spring of 1987.

This information was material in that it is substantially likely that a reasonable investor would have considered these facts important in making an investment decision.

(6) In sum, as a result of all of his sales of Crazy Eddie stock, Sam M. obtained gross proceeds of $19,531,875. As for Allen, he obtained gross proceeds totaling $3,901,000. Kuszer obtained total gross proceeds of $1,050,000.

(7) In the March, 1985 secondary public offering, Eddie sold an aggregate of 150,000 shares of Crazy Eddie stock on behalf of Relief Defendants Rori Antar, Sam A. Antar, Michelle Antar, Adam Kuszer, Sam Kuszer, and Simon Kuszer, for gross proceeds of

$3,150,000. When he did so, Eddie knew of the fraudulent activities perpetrated at Crazy Eddie and, in addition, knew that the warehouse inventories had been inflated on March 3, 1985, and that the company's inflated financial results would be publicly announced in April 1985.

## B. *Remedies*

### (1) *Permanent Injunction*

 The SEC seeks an order enjoining Sam M., Allen, and Kuszer from violating federal securities laws in the future. Permanent injunctive relief is expressly authorized by Congress to proscribe further violations of federal securities laws. 15 U.S.C. § 78u(d). "The purpose of injunctive relief is not to punish the violator, but to deter him from committing future infractions of the securities laws." *SEC v. Bonastia,* 614 F.2d 908, 912 (3d Cir.1980). The SEC must demonstrate that "there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct." *Id.; see also SEC v. Materia,* 745 F.2d 197, 200 (2d Cir. 1984); *SEC v. Kimmes,* 799 F.Supp. 852, 860 (N.D.Ill.1992), *aff'd,* 997 F.2d 287 (7th Cir. 1993). To determine whether there is a reasonable likelihood of future violations, courts generally consider the following factors: (1) the degree of scienter involved on the part of the defendant; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the sincerity of his assurances against future violations; and (5) the likelihood, because of defendant's professional occupation, that future violations might occur. *Bonastia,* 614 F.2d at 912.

 This court concludes that there is a reasonable likelihood that Sam M. will commit future securities law violations if he is not enjoined from doing so. As detailed throughout this opinion, Sam M., as patriarch of the Antar family as well as co-founder, Executive Vice President and director of Crazy Eddie, participated directly and extensively in the schemes perpetrated at Crazy Eddie throughout the relevant time period. He acted knowingly and intentionally in vio-

lating the federal securities laws over an extended period of time, which involved large sums of money. Sam M. has never acknowledged recognition of the wrongful nature of his conduct, maintaining throughout the history of this litigation that he had no involvement or knowledge of what was happening at the company. Because he has failed to acknowledge the wrongfulness of his conduct, any attempt on his part to assure this court that he will not engage in such illegal conduct—something which Sam M. has not done—would ring hollow.

Sam M.'s business activities and relations certainly make it likely that he may engage in future violations. Although lacking in much formal education, Sam M. has shown himself throughout his life to be an acute businessman. Business is in his blood. This court has no doubt that Sam M. will continue in developing businesses and in this regard, he will inevitably be placed in circumstances where he will again be tempted with violating federal securities laws.

Significantly, the recurrent nature of the violations of securities laws makes it extremely likely that Sam M. may, without an injunction, commit future violations. *See SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir.1975) (recognizing that "the commission of past illegal conduct is highly suggestive of the likelihood of future violations"); *CFTC v. American Metal Exchange Corp.,* 693 F.Supp. 168, 172 (D.N.J. 1988) ("Whether or not there is a reasonable likelihood of future violations depends upon a consideration of the totality of the circumstances and may be inferred, or even presumed, from past unlawful conduct, and the absence of proof to the contrary."). The violations on the part of Sam M. were not simply an isolated act.

 This court also concludes that an injunction is necessary with respect to Allen and Kuszer. Although they may not have been as intricately involved in all aspects of developing and implementing the schemes at Crazy Eddie as Sam M., they certainly were aware of what was occurring, and in some instances, actively participated in fraudulent

activity. Their conduct throughout the relevant time period evidenced a high degree of scienter. Moreover, although they did not sell as many shares as Sam M., it would be naive for this court to conclude that the violations of securities laws were but an isolated episode. Both Allen and Kuszer engaged in, facilitated, or were intimately aware of the multitude of frauds perpetrated at the company.

As with Sam M., this court harbors no doubt that Allen and Kuszer will continue to engage extensively in developing and operating businesses. Under these circumstances, the protection of the investing public necessitates that Allen and Kuszer, along with Sam M., be enjoined from any further violations of federal securities laws.

### (2) *Disgorgement*

■ The SEC also seeks an order requiring the defendants to disgorge all profits derived from their insider trading activities. Courts have the authority, pursuant to § 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and § 27 of the Exchange Act, 15 U.S.C. § 78aa, to order disgorgement of insider trading profits in an SEC enforcement action. *See SEC v. Hughes Capital Corp.,* 124 F.3d 449, 455 (3d Cir.1997); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C.Cir.1989); *SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir.1987). Disgorgement is an equitable remedy by nature, and the district court is therefore invested with broad discretion in fashioning an appropriate disgorgement order. *SEC v. Hughes Capital Corp.,* 917 F.Supp. 1080, 1085 (D.N.J.1996), *aff'd,* 124 F.3d 449 (3d Cir.1997). As noted by the district court in *Hughes Capital,* " '[d]isgorgement wrests ill-gotten gains from the hands of a wrongdoer ... [and thus] [i]t is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs.' " *Id.* (quoting *SEC v. Huffman,* 996 F.2d 800, 802 (5th Cir.1993)); *see also SEC v. First Pacific Bancorp,* 142 F.3d 1186, 1191 (9th Cir.1998) ("Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable.").

While " 'disgorgement need only be a reasonable approximation of profits causally connected to the violation,' " *SEC v. Patel,* 61 F.3d 137, 139 (2d Cir.1995) (quoting *First City Fin.,* 890 F.2d at 1231), it may not be ordered as a punitive measure, *Hughes Capital,* 917 F.Supp. at 1085.

■ Clearly, based upon the findings of this court, the defendants must be ordered to disgorge any profits made and any losses avoided from their trading of Crazy Eddie stock while in possession of material, nonpublic information concerning the multitude of frauds perpetrated at the company.

■ With respect to the Relief Defendants, there is no evidence that they either participated in or were aware of the extensive frauds perpetrated at Crazy Eddie between 1979 and 1987. This does not mean, however, that the proceeds derived from the stock of stock on their behalf are insulated from disgorgement.

In *SEC v. Antar,* 831 F.Supp. 380, 398 (D.N.J.1993), a case brought by the SEC against Debbie I and her children, the court recognized that "[w]here a federal court has subject matter jurisdiction, it has the authority to grant the full panoply of equitable remedies so that the plaintiff can obtain complete relief." Included within the panoply of equitable remedies are constructive trusts and disgorgement of unjustly retained wealth, described by the court as "longstanding remedies that are within a court's equitable powers." *Id.*

The court further recognized that Supreme Court jurisprudence had interpreted securities statutes to confer jurisdiction over claims against non-violators. In *Deckert v. Independence Shares Corp.,* 311 U.S. 282, 288–89, 61 S.Ct. 229, 85 L.Ed. 189 (1940), a case concerning the Securities Act, the Court held that federal courts had jurisdiction over a claim in a securities fraud action seeking relief from a non-party who held funds sought by the plaintiffs, even though the Securities Act did not contain express language conferring such jurisdiction over non-parties. The *Antar* court stated:

"That it does not authorize [a] bill [in equity as to third parties] in so many words is no more significant than the fact that it does not in terms authorize execution to issue on a judgment recovered under [the statutory provision authorizing the private right of action]." In the Supreme Court's view, jurisdiction over third parties was properly based on the intention underlying the "Act as a whole" and the unavoidable implication that the Act intended "the power to make effective the right of recovery afforded by the Act."

831 F.Supp. at 399 (quoting *Deckert*, 311 U.S. at 287–88, 61 S.Ct. 229).

Similarly, in *SEC v. Cherif*, 933 F.2d 403, 414 n. 11 (7th Cir.1991), the Seventh Circuit Court of Appeals noted:

A court can obtain equitable relief from a non-party against whom no wrongdoing is alleged if it is established that the non-party possesses illegally obtained profits but has no legitimate claim to them. Courts have jurisdiction to decide the legitimacy of ownership claims made by non-parties to assets alleged to be proceeds from securities law violators.

In discussing *Cherif*, the *Antar* court concluded that the "touchstone for jurisdiction is whether the non-party's claim to the property is legitimate, not whether the party is innocent of fraud or wrongdoing." 831 F.Supp. at 399; *see also International Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 (2d Cir.1974) ("[T]he district court had ample power, as a court of equity, to reach [a nonviolator's] assets under the jurisdictional purview of the 1934 Act.").

 One method by which the SEC may reach the illegally obtained proceeds of fraudulent stock sales is the doctrine of unjust enrichment. To recover under this doctrine, "a plaintiff must establish that the defendant was enriched and that 'the circumstances dictate that, in equity and good conscience, the defendant should be required to

turn over its money to the plaintiff.'" *Antar*, 831 F.Supp. at 402 (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 79 (2d Cir.1986)).

As discussed previously in this opinion, in the March, 1985 secondary public offering, Eddie, knowing of the myriad of frauds perpetrated at Crazy Eddie, sold an aggregate of 150,000 shares of Crazy Eddie stock on behalf of Relief Defendants Rori Antar, Sam A. Antar, Michelle Antar, Adam Kuszer, Sam Kuszer, and Simon Kuszer, for gross proceeds of $3,150,000. This court therefore finds that the Relief Defendants do not have a legitimate claim to the proceeds derived from the March, 1985 sale of stock made on their behalf by Eddie. The Relief Defendants should not be permitted to retain funds derived from the multifarious frauds perpetrated at the company, primarily at the direction of Eddie. While there is no allegation that the Relief Defendants either participated in or were aware of the frauds, their enrichment came at the expense of defrauded investors, and thus, equity mandates that the interests and rights of the victims take precedence.

In sum, this court will order full disgorgement of profits from Sam M., Allen, Kuszer, and the Relief Defendants.[33]

### C. Conclusion

For the reasons stated above, the court finds in favor of the SEC on all claims. Defendants will be permanently enjoined from future violations of federal securities laws. Defendants and Relief Defendants will further be ordered to disgorge all profits from the above-described illegal transactions.

Counsel for the SEC is directed to submit to the court on fifteen (15) days notice a proposed form of order in accordance with this opinion.

---

**33.** In its Amended Complaint, the SEC also sought an order enjoining Sam M. from serving as a director or officer of any issuer of securities. The SEC has apparently determined not to press this issue, as it has not been presented as an issue in the Final Pretrial Order nor included in its Proposed Findings of Fact and Conclusions of Law.